IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

ROBERT MITCHELL,

       Plaintiff,                     No. CIV S-06-2321 GEB GGH P

   vs.

D.G. ADAMS, et al.,                          ORDER &

      Defendants.               FINDINGS AND RECOMMENDATIONS

_____/

<u>Introduction</u>

      Plaintiff, a state prisoner proceeding pro se and in forma pauperis, seeks relief pursuant to 42 U.S.C. § 1983.  Pending before the court is defendants' April 10, 2007, motion to dismiss, to which plaintiff filed his opposition on May 25, 2007.

<u>Complaint</u>

      The court herein exhaustively sets forth the allegations of plaintiff's 55-page complaint.  Plaintiff sues some twenty-nine (29) defendants: 1) Corcoran State Prison Employees: D. G. Adams, D.D. Ortiz, K. Daveiga,[1] J.A. Diaz, T. Galaviz, B. Streeter, P.

_____

[1] Defendants, in their motion to dismiss, have attempted to provide the correct spelling for this defendant's name; however, in doing so they have spelled it alternatively, "Daviega" and "Daveiga."  <u>See</u> Motion to Dismiss (MTD), n. 1.  The court will spell it "Daveiga," as that spelling seems to appears more frequently in defendants' motion.

1  Chatham, J. Hill, R. Hubach, A. Morrison, J. Diaz, S. Tellerico; and 2) High Desert State Prison

2  Employees: T. Felker, M. McDonald, D. Gunter, M. Wright, D. Billings, D. Vanderville, C.

3  Adams, S. Babich, R. Ingwerson, G. Marshall, A. Harnden, K. McCraw, J. Lynn, B. Epperson,[2]

4  C. Lockard, J. Owen, D. Hellwig.  Plaintiff expressly states that he has exhausted his

5  administrative remedies as to "all facts" presented in his complaint as of September 22, 2006.

6  He also alleges that his State Board of Control claim was denied on September 27, 2006.

7  Complaint, p. 16.

8        Plaintiff was incarcerated at High Desert State Prison (HDSP) at the time of filing

9  his complaint.[3]  He alleges that defendants at both Corcoran State Prison (CSP) and HDSP

10  "collectively conspired" to violate his rights under the First and Fourteenth Amendments.  Id.

11        Plaintiff contends that his conflict with defendants D.G. Adams, D.D. Ortiz, K.

12  Daveiga, J.A. Diaz, T. Galaviz, B. Streeter, P. Chatham, J. Hill, R. Hubach, A. Morrison, J. Diaz

13  and S. Tellerico started following his arrival at CSP on December 17, 2004.  From then until

14  March 21, 2006, plaintiff filed numerous complaints against these defendants and other CSP

15  correctional officers (C/Os).  Id., at 17.

16        On December 6, 2005, plaintiff submitted a grievance to the above-

17  named defendants, alleging discrimination against African American inmates in compelling

18  them, including plaintiff, to double cell with African American prisoners only, forcing non-

19

20     [2] Although plaintiff originally spelled this defendant's name as "Epherson," plaintiff later provided the apparently corrected spelling of "B. Epperson" for this individual, pursuant to the

21  Order, filed on Feb. 21, 2007.  Service of process on this defendant was again attempted, pursuant to the Order, filed on May 11, 2007.  Defendant B. Epperson's executed waiver was

22  filed on September 7, 2007.  In filing their motion to dismiss, defendants noted that, at least at that the time, defendant "B. Epherson" had not yet been served.  However, given that an executed

23  waiver of service as to this defendant has since been filed, this defendant (or his/her counsel) is remiss in having failed either to file a notice of joinder in the pending motion, a separate motion

24  to dismiss or an answer on this defendant's behalf.  This defendant must show cause, within ten (10) days, why he/she should not be found to be in default.

25

26     [3] By notices of change of address, filed on December 27, 2007, and January 4, 2008, plaintiff informed the court of his transfer to California State Prison-Sacramento.

affiliated African American inmates, including plaintiff, to double cell with those who participated in active inmate gangs and by punishing plaintiff and other non-gang affiliated African American inmates for serious rule violations committed by the gang participants.  Id.

On December 21, 2005, plaintiff was interviewed by defendant J.A. Diaz, regarding the Dec. 6, 2005, grievance.  Defendant J.A. Diaz stated: "Mitchell, your ass is still here!  I'm going to see to it that your ass gets transferred out of Corcoran because we're tired of you filing complaints."  He went on to tell plaintiff that defendant Warden D. G. Adams told him to interview plaintiff as to the Dec. 6, 2005, grievance.  Defendant J.A. Diaz noted that plaintiff's complaint involved the potential lockdown of the entire African American inmate population related to the Dec. 13, 2005, scheduled execution of "Crip gang leader, Stanley 'Tookie' Williams," and discrimination against African American inmates in housing and punishment.  Id., at 17-18.

After plaintiff explained his complaint as to housing and punishment of African American inmates, defendant J.A. Diaz noted that plaintiff had been filing complaints against CSP administration every month since his arrival and informed plaintiff that he had just attended a staff meeting with defendants Warden Adams and Associate Warden Ortiz, and several C/O's from the yard "where we discussed your complaint filing and your assisting other inmates with their complaint filing against staff."  Defendant J.A. Diaz told plaintiff that "we're" not going to tolerate his continued complaint filing, that the method of housing and disciplining of African American inmates would not change, and that plaintiff would be transferred from CSP.  Id., at 18-19.

Upon plaintiff's stating that he would file a complaint because defendant J.A. Diaz was violating his First Amendment rights, defendant J.A. Diaz informed plaintiff that he had no rights other than "what we give you."  He also told plaintiff that he had instructed defendant Appeals Coordinators T. Galaviz and B. Streeter and all of his staff to no longer address plaintiff's complaints because plaintiff was going to be transferred from CSP.  Id., at 19.

On Dec. 30, 2005, plaintiff filed a grievance (CSPC-3-06-00115) against defendant J. Hill for threatening plaintiff's safety/life.  On Jan. 4, 2006, plaintiff was called to defendant J. Diaz's office, where J. Diaz was present along with defendants J.A. Diaz and S. Tellerico, and plaintiff was informed by these defendants that they were putting plaintiff up for transfer to "a 180 prison" because plaintiff had filed too many complaints and defendant Warden Adams had told them to transfer plaintiff out of CSP.  Plaintiff informed these defendants that he had not gotten any disciplinary write-ups in the form of CDC-115's at CSP and asked why his security housing level was being upgraded and he was to be transferred to a "180 design prison." Id., at 20.

Defendants J. Diaz and Tellerico told plaintiff that "we don't want your kind here, so you're being transferred," while defendant J.A. Diaz referred back to his Dec. 21, 2005, interview with plaintiff, telling plaintiff that people like him "who file lawsuits and complaints are troublemakers and they have to go."  Plaintiff replied that he would be filing a complaint against each of these individuals, to which defendant J. A. Diaz responded: "[T]his is why we're transferring you, to avoid having to respond to anymore of your complaints.  We'll get rid of you and we won't have to respond to, or return any of your complaints you have pending."  Id., at 21.

On Feb. 22, 2006, defendant J. Hill called plaintiff into his office about complaint no. CSPC -3-06-00652, which plaintiff had filed against defendant A. Morrison.  Defendant Hill told plaintiff that he wanted to talk to him about the grievance against Morrison which plaintiff had filed contending that Morrison had confiscated and destroyed plaintiff's legal documents, as well as about CSPC-3-06-0115, which plaintiff had filed against defendant Hill for threatening plaintiff's safety.  Id., at 21-22.

Defendant Hill called defendant Morrison to his office and Hill told plaintiff to explain the circumstances giving rise to the grievance, whereupon plaintiff said that, on Nov. 12, 2005, defendant Morrison stopped plaintiff as he carried envelopes containing legal material and asked plaintiff what was in the envelopes.  Plaintiff told Morrison that he was on the way to the

4

law library to conduct legal research and to mail out his legal documents and showed Morrison

the documents, whereupon defendant Morrison snatched up the documents and tore them up,

telling plaintiff he could not have them.  Plaintiff explained that they had been sent to him by the

state attorney general's office and concerned a pending case of his and were not contraband.

Morrison told plaintiff that the documents pertained to a lawsuit against correctional staff and

that they were "'FLSA' time sheets" that plaintiff could not have.  Plaintiff told Morrison that his

having destroyed the documents sent by the attorney general's office before plaintiff had had a

chance to address appeal issues violated his First and Fourteenth Amendment rights, to which

Morrison replied that he did not care about plaintiff's rights and stated that since plaintiff had

arrived, inmates had started filing lawsuits and staff complaints had increased.  Id., at 22-23.

        When Morrison tore up the documents, plaintiff informed him that he would file a

complaint against him to which Morrison responded that he did not care "because don't you

know that correctional staff at Corcoran don't find other correctional staff guilty of rule

violations.  Nothing is going to happen." Id., at 24.

        When defendant Hill asked defendant Morrison if plaintiff's version of events had

occurred as plaintiff told it, defendant Morrison stated "yes," and also said that he had told

plaintiff they were tired of him and his complaint filing.  When plaintiff told defendant Hill that

in light of Morrison's admission that plaintiff expected Hill to hold Morrison accountable to

departmental policy and procedure, defendant Hill "became enraged," approaching plaintiff with

a clenched fist and shouting, inter alia, "I don't give a rat's ass about you or your complaints.

We run this fucking yard the way we see fit and we don't have to answer to anyone.  Now, I'm

telling you to drop your complaints, if you know what's good for you." Id., at 24-25.

        Defendant Morrison then threatened plaintiff with a "blanket party," saying "if

you keep on snitching and filing complaints, we're going to come an[d] pay your ass a visit

dressed all in black and snatch your ass out of your cell at 2 or 3 o'clock in the morning and beat

your ass!  We've done this shit before and we'll do your ass too!"  Both defendants laughed and

1   warned plaintiff to drop grievances nos. CSPC-3-06-00115 and CSPC -3-06-00652, and were

2   heard by unidentified inmates and correctional staff.  The next day, Feb. 23, 2006, plaintiff filed

3   a complaint against defendants Hill and Morrison for the incident of Feb. 22, 2006, no. CSPC-3-

4   06-01022.  Id., at 25-26.

5           On Feb. 25, 2006, defendant R. Hubach interviewed plaintiff about grievance no.

6   CSPC-3-06-00115, telling plaintiff that defendants Warden Adams, Assoc. Warden Ortiz, and

7   Captain Daveiga, his supervisors, were tired of plaintiff's constant "snitching" and complaint

8   filing and had told Hubach to make the complaint "go away."  He told plaintiff that it could be in

9   his "best interest" to withdraw CSPC-3-06-00115.  When plaintiff protested, defendant Hubach

10  told him that if the complaint was not dropped, plaintiff would be put in administrative

11  segregation (ad seg), "and we will see to it [] that you don't go home on your release date."

12  Plaintiff withdrew the grievance in fear for his life and of losing his release date.  Defendant

13  Hubach's statements were made in front of unidentified inmates and correctional staff.  Id., at 26-

14  27.

15          On March 15, 2006, plaintiff was called to defendant J. Diaz's office about a

16  complaint he had filed concerning race classification and African American inmates' cell

17  assignments.  When asked, plaintiff informed J. Diaz that he was not a gang member but was

18  complaining that he was being discriminated against by being classified by race and forced to be

19  housed only with African American inmates.   Defendant J. Diaz stated that all African American

20  inmates get punished when one commits a serious rules violation "because it is the 'mindset' of

21  blacks to assault correctional staff."  Defendant J. Diaz went on to tell plaintiff that that is the

22  way it is at Corcoran and that, although plaintiff was right that he should be able to cell with any

23  race, California was not New York and that "out here, there is [sic] racial politics in prison

24  between inmates and between correctional staff."  Defendant J. Diaz also told plaintiff that racial

25  segregation was allowed among inmates "because this is what the inmates want."  Id., at 27-28.

26  \\\\\\

When plaintiff mentioned that the Supreme Court and the Ninth Circuit had said that prison racial segregation was unconstitutional, Diaz told him that he knew about "the Johnson v. California[4] ruling," but that it meant nothing because "our union allows us to run these prisons as we see fit, and there is nothing any court can do about it" and that "some court" would not stop segregation practices that had been on-going "for years." Conceding that plaintiff was right, defendant J. Diaz told him he was nevertheless not going to grant the appeal, but instead was transferring him from CSP because of the many problems his complaint filing caused. Id., at 28.

On March 16, 2006, defendant R. Chatham interviewed plaintiff about grievance no. CSPC-3-06-01022, which plaintiff had filed against defendants Hill and Morrison. Defendant Chatham said that he had spoken with Correctional Counselor Smooth (not a defendant) and Inmate L. Wimberly, CDC No. P-92181, who both confirmed hearing yelling and threats from defendant Hill's office on Feb. 24, 2006; plaintiff confirmed that these defendants had threatened to harm him on that day if he did not drop this complaint, which plaintiff told defendant Chatham that he wanted to do to avoid a staff assault. Chatham replied that he could not guarantee that correctional staff would not assault plaintiff but "strongly" suggested plaintiff drop the complaint and "not pursue any more" if plaintiff valued his safety. He also mentioned that plaintiff would be transferred due to all of his complaint filing. Id., at 26-27.

Plaintiff reports that on March 17, 2006, Corr. Counselor Smooth "became verbally hostile" with Inmate Wimberly, yelling because Wimberly had put his name in a report with which he did not wish to be associated, concerning the Feb. 24, 2006, incident in defendant Hill's office (concerning plaintiff's being admonished to drop CSPC-3-06-01022, about the earlier Feb. 22, 2006, incident in Hill's office).

---

[4] Johnson v. California, 543 U.S. 499, 125 S. Ct. 1141 (2005) (equal protection challenge to state corrections dept.'s unwritten policy of double-celling new/transferred inmates in initial 60-day evaluation with cellmates of same race is subject to strict scrutiny standard of review).

1        On March 21, 2006, before plaintiff received any appeal responses to grievances

2  CSPC-3-06-00115, CSPC -3-06-00652 or CSPC-3-06-01022 or his complaint relating to

3  classification and cell assignment of African American inmates, plaintiff was transferred to

4  HDSP, with increased security level housing status, where he was housed on a 180 design yard

5  for inmates with serious disciplinary problems.  Upon his arrival at HDSP, he was forced into a

6  holding cell for African American inmates only and all of his legal and personal property were

7  contraband.  Id., at 30-31.

8        Plaintiff was interviewed by three unnamed correctional lieutenants who told him

9  that at HDSP all cell and job assignments, etc., were made by race.  Plaintiff was told that there

10  were no "'black cells'" on the 270 design yard and because of what had happened between

11  himself and CSP correctional staff, he would be housed in a 180 design special housing unit for

12  "'black inmates with serious disciplinary problems.'" Id., at 31.

13        On March 23, 2006, plaintiff was interviewed by three unit classification

14  committee members (UCC), defendants D. Vanderville, D. Hellwig, and J. Owen, who told

15  plaintiff that he was "a non-adverse transfer from Corcoran," but that there was a memo from

16  CSP UCC members defendants J.A. Diaz, J. Diaz, and Tellerico, saying that plaintiff files

17  complaints and lawsuits and must be housed at an increased security housing level and on 180

18  design special housing.  Id., at 31-32.

19        Plaintiff was told by defendants Vanderville, Hellwig, and Owen that he would be

20  housed on the C-Facility 180 yard because he was black, there were no open "black cells" on the

21  270 yard, and because Corcoran had so advised them.  When plaintiff protested that he could be

22  housed with any race, according to departmental policy and procedure, and that he had no

23  disciplinary sanctions from CSP and did not display aberrant behavior to warrant increasing his

24  security status from 270 to 180, he was told by these defendants that he was being upgraded

25  because he filed "too many lawsuits and complaints on staff," and this way he could be confined

26  to his cell for 23 hours a day which would prevent him from engaging in such activity.  Id., at 32-

1   33.

2        Plaintiff complained that the CSR[5] endorsed him for housing on a 270 design

3   yard, to which defendants Vanderville, Hellwig, and Owen replied that they did not have to

4   follow the endorsement, that plaintiff was black and no black cells on the 270 yard were open,

5   that even if there were, he would not be housed there based on Corcoran's administration having

6   said to upgrade his security housing level.  Plaintiff said that when he had arrived at HDSP

7   Receiving and Release (R&R), he had arrived with white, Hispanic, and Asian inmates who were

8   taken to be housed on the 270 yard.  In addition to being housed on a 270 design yard, he asked

9   that he receive a clerk position equivalent to the job assignment as GED clerk he had had at CSP

10  with a pay number.  These defendants told plaintiff the other inmates who were sent to be housed

11  on the 270 design yard were not black and did not file complaints and lawsuits against staff and

12  that at HDSP, "everything is done according to race" and black inmates who sue correctional

13  staff do not receive clerk assignments.  When plaintiff complained of a violation of his First and

14  Fourteenth Amendment rights for which he intended to file a complaint, he was told that for

15  threatening to file a complaint, he would be deprived of his legal and personal property.  Id., at

16  33-34.

17       On March 23, 2006, plaintiff contacted his attorney, Robert A. Bailey, to enlist his

18  help in securing his legal and personal property so that plaintiff could meet court deadlines.

19  HDSP's Litigation Coordinator told his lawyer that she would track down plaintiff's legal

20  property to give to plaintiff.  On March 29, 2006, plaintiff avers that defendants T. Felker, M.

21  McDonald, D. Billings, D. Gunter, D. Vanderville, G. Marshall, A. Harnden, K. McCraw, M.

22  Wright, and J. Lynn had a staff meeting and discussed race-based classification and cell

23  assignments raised by plaintiff on March 23, 2006, and the Johnson v. California [supra, 543

24  U.S. 499, 125 S. Ct. 1141] decision requiring prison cell desegregation.  According to plaintiff,

25

26       [5] Classification Staff Representative.

9

these HDSP defendants all concluded that they could ignore the order to CDCR to desegregate its prisons. Id., at 35-36.

On March 30, 2006, plaintiff filed a 602 appeal no. HDSP-C-06-00807, concerning his transfer and the classification/cell assignment of African American inmates.  On April 6, 2006, defendant B. Epperson escorted plaintiff to R&R, where much of his legal and personal property had been damaged and was confiscated, including, among other items, a cassette radio, new razors, a doctor-prescribed knee/ankle brace wrap, a pair of Nike shower shoes, a new hair brush, a pair of head phones, a pack of T-shirts, a pair of Reebok tennis shoes, a beard trimmer.   Legal property confiscated included a Black's Law Dictionary, Deering's desktop Federal Rules of Civil Procedure, all of plaintiff's case law and federal and state writs, writing pens, pleading paper, postage stamps and envelopes. Id., at 36-37.

Defendant Epperson and an unnamed staffmember told plaintiff his property was being confiscated because plaintiff had had his lawyer call and because he was housed on C-yard. Plaintiff said that he had been told by Corcoran R&R staff that none of his personal and legal property was contraband and that he had observed white, Hispanic and Asian inmates with some of the same items.  Defendant Epperson told him that because he was black and housed on the C-Facility 180 design yard, he was not allowed the property.  When plaintiff stated that he was filing a complaint alleging violation of his constitutional rights, he was told by Epperson (and the unnamed R&R staffmember) that at HDSP, things were done by racial classification and they did not answer to the courts. Id., at 37-38.

Plaintiff alleges that from March 20, 2006, until the present (the time of filing his complaint, on October 20, 2006), he had repeatedly submitted requests/complaints to no avail to defendant S. Babich at HDSP, and to CSP defendants Galaviz and Streeter, to respond to and forward his grievance nos. CSPC-3-06-00115, CSPC -3-06-00652 and CSPC-3-06-01022, as well as his complaint about HDSP African American inmate classification/cell assignments.  Id., at 38-39.

1    Plaintiff alleges that Corcoran State Prison defendants, D. G. Adams, D.D. Ortiz,

2   K. Daveiga J.A. Diaz, T. Galaviz, B. Streeter, P. Chatham, J. Hill, R. Hubach, A. Morrison, J.

3   Diaz, S. Tellerico, conspired together to transfer him to High Desert in retaliation for his filing

4   grievances and to avoid responding to or returning his pending appeals and increased his security

5   housing level and confiscated and destroyed his property in violation of his First Amendment

6   rights.  Id., at 39.  Defendants J.A. Diaz, K. Daveiga,  P. Chatham, J. Hill, R. Hubach, and A.

7   Morrison conspired and threatened to physically harm him and place him in ad seg if he did not

8   withdraw his grievances, which he did out of fear in violation of his rights under the First

9   Amendment.  Defendants D. G. Adams, D.D. Ortiz, K. Daveiga, J.A. Diaz, T. Galaviz, B.

10   Streeter, P. Chatham, J. Hill, R. Hubach, A. Morrison, J. Diaz, S. Tellerico, all threatened

11   plaintiff with physical harm, with delaying his release date, with placing him in ad seg, and

12   conspired to retaliate against him in the form of a prison transfer, and denied him full exhaustion

13   of his administrative remedies.  Id., at 40.

14    Defendants T. Felker, M. McDonald, D. Gunter, M. Wright, D. Billings, D.

15   Vanderville, C.Adams, S. Babich, R. Ingwerson, G. Marshall, A. Harnden, K. McCraw, J. Lynn,

16   [B. Epherson], C. Lockard, J. Owen, D. Hellwig at High Desert State Prison all ratified the

17   retaliatory conduct of the CSP defendants by refusing to take corrective measures and by

18   increasing his security housing level, by confiscating and destroying plaintiff's personal and legal

19   property, all at the request of the CSP defendants, in violation of plaintiff's First Amendment

20   rights.  Id., at 41.

21    Plaintiff alleges that all of the defendants "maintain segregationist policies,"

22   harboring a discriminatory animus against plaintiff and other African American inmates,

23   requiring them to be double celled only with African Americans, and in separate holding cells, a

24   claim of a violation of the Equal Protection Clause of the Fourteenth Amendment.  Id., at 42-48.

25   Plaintiff also alleges a state tort claim of negligence, contending that defendants inflicted

26   physical, mental and emotional injuries upon him by their acts and omissions.  He claims that he

1   has lost wages, legal and personal property, and suffered "severe pain, humiliation,

2   indignities...." Id., at 49-50.[6]  Plaintiff also claims defendants' conduct was willful, wanton,

3   malicious and oppressive. Id., at 52.  Plaintiff seeks compensatory and punitive damages, a

4   declaratory judgment and injunctive relief. Id., at 44-53.

5   <u>Motion to Dismiss</u>

6              Defendants[7] move for dismissal under nonenumerated Fed. R. Civ. P. 12(b) for

7   failure to exhaust administrative remedies and, as to certain defendants, under Fed. R. Civ.

8   12(b)(6), for failure to state a claim.  Motion to Dismiss (MTD), pp. 1-2.  As to defendants'

9   motion to dismiss for failure to state a claim, under Rule 12(b)(6), this court need not reach

10  defendants' argument because, as to the defendants at issue on that ground, defendants Babich,

11  Ingwerson, Lockard and C. Adams (MTD, pp. 10-12), plaintiff does not oppose this portion of

12  defendant's motion, instead himself moving for voluntarily dismissal of these defendants from

13  this action, citing Fed. R. Civ. P. 41(a)(1).  <u>See</u> Opposition (Opp.), pp. 36-38.  Therefore, these

14  defendants will be dismissed, and this portion of defendants' motion denied as moot.  The court

15  now considers the motion as to the remaining ground as to the remaining defendants.

16        *<u>Legal Standard under Non-Enumerated Fed.R.Civ.P. 12(b)</u>*

17             In a motion to dismiss for failure to exhaust administrative remedies under non-

18  enumerated Rule 12(b) of the Federal Rules of Civil Procedure, defendants "have the burden of

19  raising and proving exhaustion." <u>Wyatt v. Terhune</u>, 315 F.3d 1108, 1119 (9th Cir. 2003).  The

20  parties may go outside the pleadings, submitting affidavits or declarations under penalty of

21  perjury, but plaintiff must be provided with notice of his opportunity to develop a record.  <u>Wyatt</u>

22  <u>v. Terhune</u>, 315 F.3d at 1120 n.14.  The court provided plaintiff with such fair notice by <u>Order</u>,

23  filed on December 13, 2006 (and again by an <u>Order</u>, filed on May 11, 2007).

24  _____

25        [6] Plaintiff's putative "state tort claim torts in essence" is not readily decipherable, much
    less colorable. Id., at 51.

26        [7] With the exception of defendant B. Epperson.  See footnote 2.

Should defendants submit declarations and/or other documentation demonstrating an absence of exhaustion, making a prima facie showing, plaintiff must refute that showing. Plaintiff may rely upon statements made under the penalty of perjury in the complaint if the complaint shows that plaintiff has personal knowledge of the matters stated and plaintiff calls to the court's attention those parts of the complaint upon which plaintiff relies. If the court determines that plaintiff has failed to exhaust, dismissal without prejudice is the appropriate remedy for non-exhaustion of administrative remedies. Wyatt v. Terhune, 315 F.3d at 1120.

*PLRA Requirements*

The Prison Litigation Reform Act (PLRA), 42 U.S.C. § 1997e(a) provides that, "[n]o action shall be brought with respect to prison conditions under [42 U.S.C. § 1983], or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." Inmates seeking injunctive relief must exhaust administrative remedies. Rumbles v. Hill, 182 F.3d 1064 (9th Cir. 1999). In Booth v. Churner, 532 U.S. 731,741, 121 S. Ct. 1819, 1825 (2001), the Supreme Court held that inmates must exhaust administrative remedies, regardless of the relief offered through administrative procedures. Therefore, inmates seeking money damages must also completely exhaust their administrative remedies. Booth v. Churner, 532 U.S. 731, 121 S. Ct. 1819 (inmates seeking money damages are required to exhaust administrative remedies even where the grievance process does not permit awards of money damages). The United States Supreme Court has held that exhaustion of administrative remedies under the PLRA requires that the prisoner complete the administrative review process in accordance with the applicable procedural rules. Woodford v. Ngo, 548 U.S. ___, 126 S. Ct. 2378 (2006). Thus, in the context of the applicable PLRA § 1997e(a) exhaustion requirement, any question as to whether a procedural default may be found should a prisoner plaintiff fail to comply with the procedural rules of a prison's grievance system has been resolved: the PLRA exhaustion requirement can only be satisfied by "proper exhaustion of administrative remedies....," which means that a prisoner cannot satisfy the

1  requirement "by filing an untimely or otherwise procedurally defective administrative grievance

2  or appeal." Woodford v. Ngo, supra, 126 S. Ct. at 2382.   Moreover, 42 U.S.C. § 1997e(a)

3  provides that no action shall be brought with respect to prison conditions *until* such

4  administrative remedies as are available are exhausted. McKinney v. Carey, 311 F.3d 1198 (9th

5  Cir. 2002).

6          *Administrative Exhaustion Procedure*

7          In order for California prisoners to exhaust administrative remedies, they must

8  proceed through several levels of appeal:  1) informal resolution, 2) formal written appeal on a

9  CDC 602 inmate appeal form, 3) second level appeal to the institution head or designee, and 4)

10  third level appeal to the Director of the California Department of Corrections.  Barry v. Ratelle,

11  985 F. Supp. 1235, 1237 (S.D. Cal. 1997) (citing Cal. Code Regs. tit. xv, § 3084.5).  A final

12  decision from the Director's level of review satisfies the exhaustion requirement. Id. at 1237-38.

13          *Discussion*

14          Defendants contend that as to several incidents, there is no evidence of plaintiff

15  ever having filed a grievance.  The first identified is the Dec. 21, 2005, interview with defendant

16  J. A. Diaz, wherein plaintiff alleged that this defendant told plaintiff he would be transferred

17  because of a December 2005 grievance he had filed and that he (Diaz) had attended a staff

18  meeting with defendant Warden Adams and defendant Associate Warden Ortiz where they had

19  discussed plaintiff's filing of grievances and assisting other inmates with staff complaints.

20  Defendant J.A. Diaz is alleged to have instructed defendants T. Galaviz and Streeter, the appeals

21  coordinators at Corcoran, not to address plaintiff's grievances and plaintiff claims that defendants

22  Galaviz and Streeter have not responded to his requests to forward copies of his appeals.  MTD,

23  p. 8.  Defendants contend that:

24              [i]n addition to the administrative appeals process, an inmate can
               file a staff complaint, in which the inmate may allege staff
25              misconduct. An inmate may make allegations of staff misconduct
               on a CDCR 602 Form, but is permitted to make his allegations in
26              the form of a letter or other writing. The nature of the misconduct

14

> may result in an investigation of the staff member. An inmate may
> also request an appointment to meet with his correctional
> counselor, and/or facility sergeant, lieutenant, captain, associate
> warden, and warden. The inmate can also make his grievance
> known to any one or all of these individuals by letter. The inmate
> may also request to have his problem addressed by his
> Classification Committee. Finally, the inmate can write a letter to
> the California State Inspector General describing the problem,
> request an investigation, and ask that the problem be addressed.

MTD, p. 7,  Exhibit A, Declaration of V. Castillo, Corcoran Appeals Coordinator, ¶ 11; Exhibit

B, Declaration of D. Jackson, HDSP, Appeals Coordinator, ¶ 11.  Plaintiff includes as part of

Exhibit D to his declaration in opposition, a copy of a letter[8] signed by defendant Warden

Adams, noting that in the Dec. 21, 2005, interview with defendant J.A. Diaz, plaintiff had

acknowledged that his concern about a lockdown of African American inmates before or after the

scheduled Dec. 13, 2005, execution (of Stanley Williams) had never materialized.  With regard

to other concerns expressed in his Dec. 6, 2005, letter to the warden about non-affiliated inmates

being subjected to lockdowns because of being housed with [gang-]affiliated inmates, plaintiff

was informed, inter alia, that situations requiring program modifications are carefully reviewed,

and determinations "made based on information provided by an investigation as to any non-

affiliated inmates and their cellmates regardless of their ethnicity." Opp., Exhibit D.  Plaintiff is

referred for further concerns to defendant J. A. Diaz, Captain, Facility 3B.  The court's review of

plaintiff's opposition, declaration in support of the opposition, and exhibits thereto, indicates that

plaintiff does not demonstrate that he ever filed either a grievance or a staff complaint with

regard to the Dec. 21, 2005, incident.  On the other hand, part of plaintiff's allegation concerning

this incident is that defendant told plaintiff that his continued complaint filing would not be

tolerated, that the housing of African American inmates would not be changed, that plaintiff

would be transferred, and that when plaintiff stated that he would be filing a grievance, defendant

J.A. Diaz told him that he had instructed the appeals coordinators not to address plaintiff's

---

[8] Plaintiff avers that the letter was dated Jan.14, 2006, but the date is illegible on the copy presented.  Opp., p. 17.

complaints. Complaint, p. 19. The fact that the letter from defendant Warden Adams

referencing that very interview and directing plaintiff to defendant J.A. Diaz for further concerns

suggests a Catch-22 for plaintiff. MTD, p. 8. The court will find in these circumstances that

plaintiff has exhausted his administrative remedies as to a claim of retaliation by defendant J.A.

Diaz with regard to this incident.[9]

As to the Jan. 4, 2006, incident, defendant maintains no grievance was filed with

respect to plaintiff's allegations that defendants J.A. Diaz, Tellerico, and J. Diaz on that day

informed him that he was being transferred to a 180 design prison because he had filed too

many grievances and they were ordered to transfer him by defendant Warden Adams. MTD, p.

8, Exhibit A, Castillo Dec. ¶ 13(c), Exhibit C, Declaration of Chief of Inmate Appeals Grannis, ¶

11(e). In opposition, plaintiff contends that on Jan. 4, 2006, he filed a 602 appeal, challenging

the transfer to a higher security 180 design prison for having filed too many grievances, seeking a

full investigation and the names of all personnel responsible for the hearing and asking that

retaliation against him be stopped. Opp., p. 22, plaintiff's Declaration in support of Opp., ¶¶18-

19. He refers to his Exhibit B, attached to his declaration and maintains that this 602 appeal has

been in the possession of Corcoran's (CSP's) administration which refuses to forward it to him.

Id. A review of plaintiff's Exhibit B reveals, inter alia, copies of grievances, filed at HDSP, on

4-20-06 and on 5-10-06, wherein plaintiff complains of having written without avail to defendant

Appeals Coordinator T. Galaviz regarding four appeals pending at Corcoran upon his transfer to

HDSP on 3-21-06, among which grievances was one appeal not identified by number but

referencing a grievance about cell assignments.[10] A copy of an appeal, dated as signed on 3-13-

07, while post-dating the filing of the complaint is largely duplicative of the earlier filed appeals,

---

[9] See conclusion.

[10] The court does not consider the appeal dated 3-13-07, wherein plaintiff complains that upon his transfer to HDSP on 3-21-06, he had four 602 appeals pending, including one dated as Jan. 4, 2006, because it post-dates the filing of this complaint.

where again plaintiff complains that upon his transfer to HDSP on 3-21-06, he had four 602

appeals pending, including one which he specifies therein as having been dated as Jan. 4, 2006.

While neither side presents a definitively convincing resolution to this factual dispute, the court

finds in this instance that defendants have not sufficiently demonstrated that plaintiff never filed

a grievance as to this incident, and while it is plain that it did not process, that failing in the

circumstances should not be found to devolve in defendants' favor, particularly in light of the

allegations of this complaint.  See discussion below.[11]

Another incident for which defendant claims no grievance was filed is for the Feb.

25, 2006, allegation that defendant Hubach told plaintiff he would be placed in ad seg and his

release date delayed if he did not drop the grievance filed against defendant Hill, No.

CSPC-3-06-00115, and wherein plaintiff alleges that defendant Hubach was told to talk to him

by defendants Warden Adams, Ortiz, and Daveiga.  MTD, p. 8.  Plaintiff also averred that he

withdrew this in fear for his life as well as because he was afraid of his release date being

extended.  Complaint, p. 27.  As to this incident, plaintiff maintains that he submitted a grievance

in the form of a letter to defendant Warden Adams, citing Exhibit E.  Opp., pp. 28-29.  Plaintiff's

Exhibit E, attached to his declaration in opposition, is a copy of a signed handwritten letter

directed to defendant Warden Adams, dated February 26, 2006.  The subject line references

"repeated threats made by Lieutenant Hubach and other correctional staff regarding the events on

February 25, 2006."  The content of letter addresses the alleged events of that day and seeks an

investigation.  Plaintiff also notes that defendants in their motion (MTD, p. 7) stated that an

inmate could make a staff complaint "in the form of a letter or other writing....which may result

in the investigation of the staffmember."  Opp., p. 28.  This form of raising a staff misconduct

issue suggests that defendants perceive this as a valid method of administrative exhaustion.[12]

---

[11] Also, see conclusion.

[12] See conclusion.

1          As to the allegation concerning the incident on March 15, 2006, wherein plaintiff

2   alleges that defendant J. Diaz told him that he was being transferred for filing grievances, which

3   defendants also identify as unexhausted,  MTD, p. 8, plaintiff expressly states that he makes no

4   separate claim as to this incident, implicitly conceding a failure to exhaust this claim separately.

5   Opp., p. 31.  This applies as well to plaintiff's March 16, 2006, allegation that he was threatened

6   with harm by defendant Chatham if he did not drop his grievance (no. CSPC-3-06-01022) against

7   defendants Hill and Morrison and allegedly told plaintiff that he was being transferred because of

8   his grievance activity.  MTD, p. 8. Plaintiff in this instance states that he is not making a separate

9   claim against defendant Chatman as to the events of March 16, 2006 (Opp., p. 31), which the

10  court will construe as plaintiff's concession that the claim is unexhausted.

11         Defendants also argue that plaintiff's allegations that, on March 23, 2006,

12  defendants Vanderville, Hellwig, and Owen upgraded his security housing level to a 180 design

13  yard because of his grievance filing activities, placed him in segregated housing because of his

14  race, and threatened to withhold his personal and legal property if plaintiff filed a grievance

15  against them are unexhausted.  MTD, p. 9, Exhibit B, Jackson Dec. ¶ 13(a), Exhibit C, Grannis

16  Dec., ¶ 11(j).  In doing so, the court finds defendants to have been at best negligent in their

17  representations and at worst disingenuous, in light of plaintiff's exhibits in opposition.  Plaintiff

18  avers that he filed a grievance on March 30, 2006, regarding this event, citing his Exhibit F.

19  Opp., p. 32.  Plaintiff's Exhibit F contains a copy of an appeal identified as HDSP-C-06-0807.  In

20  the appeal (with attachment), dated by plaintiff as initially filed on 3-30-06, plaintiff complains,

21  inter alia, of having been informed by three HDSP UCC (Unit Classification Committee

22  members) on March 23, 2006, that he was to be housed on the C-Facility 180 yard due to his

23  being black, notwithstanding his express desire to be housed with anyone on the 270 yard, who,

24  in reviewing his C-file, observed he was a non-adverse transfer but that Corcoran's Classification

25  Committee had noted that he filed complaints and should be housed on a 180 design yard.  The

26  appeal was partially granted at the first level to the extent that he was to be placed on a waiting

1   list for the Facility B 270 yard, noting that his claim was one of discrimination based on his race

2   in being confined to a 180 design yard.  Plaintiff's claim was exhausted at the third level in a

3   director's level appeal decision, dated Sept. 22, 2006.  To the extent that plaintiff claims these

4   defendants allegedly threatened to withhold his legal and personal property, that specific claim

5   does not appear to have been exhausted; however, his claim of retaliation for grievance filing and

6   of racial discrimination in his housing as to these defendants appears adequately exhausted.[13]

7   Plaintiff goes on to say that in each level of review he requested the names and titles of all

8   correctional personnel responsible for the classification and cell assignments of inmates, and the

9   appeal responses bear him out on this point.  The second and third level appeal responses

10  indicate that this request was granted in part because the staff responsible for plaintiff's own

11  classification was provided on the March 23, 2006, classification chrono (CDC 128G), which is

12  not provided by either party.  The court logically infers, however, that notwithstanding plaintiff's

13  broadsweeping request for the name of all supervisory personnel responsible inmate

14  classification and cell assignments that plaintiff's grievance is exhausted only as to those

15  members of the March 23, 2006, HDSP classification committee who met with plaintiff and

16  determined his housing assignment.  Thus, while plaintiff's allegations as defendants

17  Vanderville, Hellwig, and Owen of discrimination/retaliation arising from his housing

18  classification on March 23, 2006, have been shown to be exhausted, his claims arising from the

19  same event against defendants Felker, McDonald, Billings, Gunter, Marshall, Harnden, McCraw,

20  Wright, and Lynn cannot reasonably found to have been exhausted and should be dismissed.[14]

21          As to the incident of March 29, 2006, additionally identified by defendants as

22  unexhausted in their motion, wherein plaintiff also alleges that defendants Felker, McDonald,

23  Billings, Gunter, Vanderville, Marshall, Harnden, McCraw, Wright, and Lynn discussed

24

25          [13] See conclusion.

26          [14] See conclusion.

1  classification and cell assignments of inmates based on the issues brought up by plaintiff in the

2  March 23, 2006, classification meeting.  MTD, p. 9.  Within plaintiff's allegations, he claims that

3  these individuals met and discussed race-based classification and cell assignments raised by

4  plaintiff on March 23, 2006, as well as the Johnson v. California [supra, 543 U.S. 499, 125 S. Ct.

5  1141] decision requiring prison cell desegregation, deciding to ignore the order to CDCR to

6  desegregate its prisons.  Complaint, pp. 35-36.  Defendants contend that no evidence

7  demonstrates that plaintiff ever filed a grievance relating to this alleged event.  MTD, p. 9,

8  Exhibit B, Jackson Dec., ¶ 3(b), Exhibit C, Grannis Dec., ¶ 11(k).  To the extent that plaintiff

9  argues that his March 30, 2006, 602 appeal no. HDSP-C-06-00807, somehow covers this

10  putative staff meeting and its alleged attendees and ensuing discussion as well, this is simply not

11  borne out by the documents plaintiff provides.  Opp., pp. 6, 32-36, Exhibit F.  No reference is

12  made either in the grievance provided or appeal responses to any March 29, 2006, staff meeting,

13  and, indeed, it is difficult to discern the basis for plaintiff's certainty as to the occurrence of a

14  meeting in which he neither represents that he was a participant or attendee or identifies his

15  source for such a meeting ever taking place.  Thus, the court must find that as to this allegation

16  against these defendants, the claim is administratively unexhausted.

17          Finally, defendants note that as to the allegations plaintiff raised in grievances

18  submitted at Corcoran, numbered CSPC-3-06-00115, filed on Dec. 30, 2005 (that defendant Hill

19  refused to replace plaintiff's property and threatened his safety), and CSPC-3-06-00652, filed in

20  Nov, 2005 (that defendant Morrison confiscated and destroyed plaintiff's legal documents in

21  Nov., 2005), plaintiff expressly states that he withdrew them and did not seek a Director's level

22  review.  MTD, p. 9.  As to the grievance filed at Corcoran on Feb. 23, 2006, no. CSPC-3-06-

23  01022, following plaintiff's Feb. 22, 2006, encounter with defendants Hill and Morrison,

24  concerning his grievances, no. CSPC -3-06-00652 and no. CSPC-3-06-00115, wherein plaintiff

25  was allegedly threatened with harm if he did not withdraw his grievances numbered CSPC-3-06-

26  00115 and CSPC -3-06-00652, defendants argue that there is no record the grievance as to this

1    incident, no. CSPC-3-06-01022, having been exhausted through the third level.  MTD, 10,

2    Exhibit C, Grannis Dec., ¶ 11(f).

3             In opposition, plaintiff argues that as to his Nov. 12, 2005, grievance against

4    defendant Morrison, concerning the confiscation and destruction of his legal property, no. CSPC-

5    3-06-00652, C/O S. G. Vasquez, not a defendant, hand-delivered it to defendant Morrison for an

6    informal level response, after which, from Dec. 7, 2005, to Jan. 26, 2006, Morrison refused to

7    file an answer within ten working days, in accordance with CAL. CODE REGS. tit.xv, § 3084.6.[15]

8    Opp., p. 12.  Instead, defendant Morrison issued a staff response on Jan. 27, 2006, rejecting the

9    appeal as exceeding appeal time limits, citing § 3084.6.[16]  Plaintiff warrants that he then filled

10   out the formal level section D portion of the appeal, stating that defendant Morrison was not

11   being truthful and that when C/O Vasquez hand-delivered the appeal, a due date of Dec. 14,

12   2005, was given.  Opp., p. 13.  After submitting the grievance for formal level review on Jan. 27,

13   2006, plaintiff contends that he was interviewed regarding the issue raised, and, on March 14,

14   2006, received a formal level response, indicating that the appeal was "partially granted."  Id.

15   Plaintiff was dissatisfied with that response and, on March 16, 2006, filed a second level appeal.

16   Id.  Plaintiff then notes that five days later, he was transferred from Corcoran to HDSP.   Id.

17   Plaintiff states that thereafter, he submitted 602 appeals to the HDSP appeals coordinator,

18   regarding his four outstanding appeals when he was transferred pending at Corcoran: CSPC-3-

19   06-00115, CSPC -3-06-00652 or CSPC-3-06-01022, as well as a 602 appeal regarding the Jan. 4,

20   2006, UCC hearing and cell assignments.  Opp., p. 14, Exhibit B to plaintiff's Dec.  A review of

21   plaintiff's Exhibit B reveals copies of inmate appeals, at least two of which were dated prior to

22   the filing of this complaint, on 4-20-06 and on 5-10-06, that were filed at HDSP, wherein

23

24       [15] CAL. CODE REGS. tit.xv, § 3084.6(b)(1) requires an informal level response to an appellant
     by staff "within ten working days."

25

26       [16] § 3084.6(c) requires an inmate/parolee file an appeal "within 15 working days of the
     event or decision being appealed, or of receiving an unacceptable lower level appeal decision."

plaintiff notes that he had written several letters to defendant Appeals Coordinator T. Galaviz at

Corcoran seeking to have the aforementioned appeals sent to him at HDSP.  HDSP Appeal

Coordinator Babich evidently sent plaintiff forms rejecting his requests, dated 4-26-06[17] and 6-

19-06, telling plaintiff, inter alia, that they were an abuse of the appeal process because plaintiff

was seeking information, not filing an appeal.  Plaintiff also includes in his Exhibit B, a copy of

an "inmate request for interview" that was directed to the HDSP warden's office, dated 5-03-06,

noting his 3-21-06 transfer to HDSP and noting that he had the above-referenced four appeals

pending at Corcoran when he was transferred.  In addition, plaintiff includes copies of Corcoran

Inmate Appeal Level I and II tracking logs for plaintiff, one dated 2-27-06 and another dated 5-

10-06, which demonstrate that grievances numbered, CSPC-3-06-00115, CSPC-3-06-00652 and

CSPC-3-06-01022, were filed.  CSPC-3-06-00115 is noted as having been received for Level 1

review on 1-20-06, with a response due dated of 3-07-06, but shown to be withdrawn on 3-16-06.

CSPC-3-06-00652 is noted as received for Level 1 review on 4-26-06, with a response due date

of 5-08-06, with no further disposition noted.  CSPC-3-06-01022 is shown to have been received

for Level 1 review on 3-10-06, with a response due on 4-24-6, with first formal level review

completed on 3-22-06, and the disposition at that level noted as "granted in part," with no further

processing.

Defendants file no response to plaintiff's evidence and representations.  As to

defendants reference to plaintiff having sought to withdraw two of his appeals, they make no

reference to the egregiousness of the alleged circumstances under which plaintiff states that he

felt compelled to do so.  While they do not concede plaintiff's allegations, neither do they dispute

the circumstances.  It would be inappropriate for defendants to succeed in an allegation of failure

---

[17] In this rejection, Babich unhelpfully suggests that plaintiff seek an interview with the
Corcoran appeals coordinator, even though plaintiff states in his 4-20-06 appeal that he had
written several letters to defendant Galaviz, Appeals Coordinator at Corcoran, identifying as his
last letter at that point as having been sent on 4-9-06, regarding his concern about the status of
the appeals and appeal time limits.

1  to exhaust administrative remedies as to some claims without their at least addressing or

2  countering the alleged misconduct by some defendants that may have precipitated the withdrawal

3  of the grievances.  Nor is any reference made to plaintiff's persistent efforts to retrieve and revive

4  them.  In <u>Booth v. Churner</u>, 532 U.S. 731, 121 S.Ct. 1819 (2001), the Supreme Court held that

5  regardless of the form of relief sought, prisoners are required to exhaust available administrative

6  remedies.  In <u>Booth</u>, the Supreme Court also stated that there were no exceptions to the statutory

7  exhaustion requirement:

8         That Congress has mandated exhaustion in either case defeats the
       argument of Booth and supporting amici that this reading of §
9      1997e (1994 ed., Supp. V) is at odds with traditional doctrines of
       administrative exhaustion, under which a litigant need not apply to
10     an agency that has "no power to decree . . . relief," <u>Reiter v.
       Cooper</u>, 507 U.S. 258, 269, 113 S. Ct. 1213, 122 L.Ed.2d 604
11     (1993), or need not exhaust where doing so would otherwise be
       futile.  See Brief for Petitioner 24-27; Brief for Brennan Center for
12     Justice et al. as Amici Curiae.  Without getting into the force of
       this claim generally, we stress the point (which Booth
13     acknowledges, see Reply Brief for Petitioner 4) that we will not
       read futility or other exceptions into statutory exhaustion
14     requirements where Congress has provided otherwise.  <u>See
       McCarthy v. Madigan</u>, 503 U.S. 140, 144, 112 S. Ct. 1081, 117
15     L.Ed.2d 291 (1992); <u>cf. Weinberger v. Salfi</u>, 422 U.S. 749, 766-
       767, 95 S. Ct. 2457, 45 L.Ed.2d 522 (1975).  Here, we hold only
16     that Congress has provided in § 1997e(a) that an inmate must
       exhaust irrespective of the forms of relief sought and offered
17     through administrative remedies.

18  <u>Booth</u>, 532 U.S. at 741 n. 6, 121 S.Ct. at 1825 n. 6.

19         However, <u>Booth</u> does not refute the principle that a complaint should not be

20  dismissed for failure to exhaust administrative remedies where prison officials do not respond to

21  an appeal in the time allowed for responding under grievance procedures.  <u>Bowers v. Mounet</u>,

22  No. Civ. A. 99-533-JFF, 2001 WL 826556 *2 footnote 1 (D.Del. 2001).  <u>See also</u> <u>Powe v. Ennis</u>,

23  177 F.3d 393, 394 (5th Cir. 1999)("[a] prisoner's administrative remedies are deemed exhausted

24  when a valid grievance has been filed and the state's time for responding thereto has expired.").

25         Prison officials have apparently not followed their own regulations regarding the

26  time for processing administrative appeals in this case.  Under these circumstances, the extreme

1   delay in the processing of plaintiff's appeal excuses further exhaustion.  See Underwood v.

2   Wilson, 151 F.3d 292, 295 (5th Cir. 1998), cert. denied, 526 U.S. 1133, 119 S. Ct. 1809 (1999)(a

3   prisoner's administrative remedies are deemed exhausted when a valid grievance has been filed

4   and the state's time for responding thereto has expired.)[18]

5          As to the claims raised against the defendants in  CSPC-3-06-00115, CSPC-3-06-

6   00652 and CSPC-3-06-01022, defendants' motion of failure to exhaust should be denied.[19]

7          *Injunctive Relief*

8          As noted earlier, court records indicate that plaintiff is no longer incarcerated at

9   either Corcoran or High Desert State Prisons.  When an inmate seeks injunctive relief concerning

10  an institution at which he is no longer incarcerated, his claims for such relief become moot.  See

11  Sample v. Borg, 870 F.2d 563 (9th Cir. 1989); Darring v. Kincheloe, 783 F.2d 874, 876 (9th Cir.

12  1986).  See also Reimers v. Oregon, 863 F.2d 630, 632 (9th Cir. 1988).  Plaintiff has

13  demonstrated no reasonable possibility that he will be incarcerated at Corcoran or High Desert

14  State Prisons at any predictable time in the future.  Accordingly, plaintiff's claims for injunctive

15  relief should be dismissed.

16         *Conclusion*

17         The undersigned's recommendation of denial of defendants' motion for failure to

18  exhaust administrative remedies as to many of plaintiff's allegations is compelled in large part

19  because the court has neither the time nor resources to conduct an evidentiary hearing to rule

20  definitively on the question of exhaustion.  Therefore, the recommendation of denial of the

21  motion as to a number of plaintiff's allegations is made without prejudice to defendants' renewal

22  of their contention that said claims are administratively unexhausted, should they be able to

23  demonstrate lack of exhaustion with additional evidentiary support at the time of trial, should this

24         [18] Abrogation on another ground recognized in Carbe v. Lappin, 492 F.3d 325 (5th Cir.

25  2007).

26         [19]  See conclusion.

24

case proceed to that point.

Accordingly, IT IS HEREBY ORDERED:

1. Defendant Epperson must show cause, within ten (10) days, why the court should not find that he/she is in default for failing to file a response to the complaint;

2. Plaintiff has moved to voluntarily dismiss defendants Babich, Ingwerson, Lockard and C. Adams from this action, and these defendants are dismissed; defendants' April 10, 2007, motion to dismiss these defendants is, therefore, denied as moot;

IT IS RECOMMENDED that defendants' April 10, 2007, motion to dismiss for failure to exhaust administrative remedies be denied in part and granted in part, as follows:

(a) denied as to plaintiff's claims of constitutional violations against defendant Morrison for alleged confiscation/destruction of plaintiff's legal property in an incident allegedly occurring in November, 2005;

(b) denied as to the plaintiff's December 6, 2005, claims of discrimination in violation of the Fourteenth Amendment against defendants D.G. Adams, D.D. Ortiz, K. Daveiga, J.A. Diaz, T. Galaviz, B. Streeter, P. Chatham, J. Hill, R. Hubach, A. Morrison, J. Diaz and S. Tellerico;

(c) denied as to plaintiff's claim of retaliation by defendant J.A. Diaz for an alleged incident arising on December 21, 2005;

(d) denied as to plaintiff's claim of retaliation against defendant Hill from an incident allegedly occurring on December 30, 2005;

(e) denied as to plaintiff's claims of retaliation by defendants J. Diaz, Tellerico, and J.A. Diaz, based on an alleged incident occurring on January 4, 2006;

(f) denied as to plaintiff's claims of retaliation by defendants Hill and Morrison, arising from an alleged incident of Feb. 22, 2006;

(g) denied as to plaintiff's claims of retaliation by defendant Hubach for an alleged incident that occurred on Feb. 25, 2006;

1      (h) granted as to plaintiff's claims of retaliation and discrimination by defendant J.

2  Diaz, alleged to have occurred on March 15, 2006, and these claims be dismissed;

3      (i) granted as to any claim by plaintiff against defendant Chatham arising from an

4  alleged incident on March 16, 2006;

5      (j) denied as to plaintiff's claims of discrimination and retaliation by defendants

6  Vanderville, Hellwig, and Owen from an alleged event occurring on March 23, 2006, but granted

7  as to claims against these defendants relating to a threat of alleged deprivation of his legal and

8  personal property and this portion of plaintiff's claim against these defendants be dismissed;

9      (k) granted as to plaintiff's claims against defendants Felker, McDonald, Billings,

10  Gunter, Marshall, Harnden, McCraw, Wright, and Lynn arising from alleged events of March 23,

11  2006, and March 29, 2006, and these defendants be dismissed;

12      2.  Plaintiff's claims for injunctive relief be dismissed as moot, and this matter

13  proceed on the remaining claims against the remaining defendants on plaintiff's claims for

14  money damages only.

15      These findings and recommendations are submitted to the United States District

16  Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within twenty

17  days after being served with these findings and recommendations, any party may file written

18  objections with the court and serve a copy on all parties.  Such a document should be captioned

19  "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections

20  shall be served and filed within ten days after service of the objections.  The parties are advised

21  that failure to file objections within the specified time may waive the right to appeal the District

22  Court's order.  <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir. 1991).

23  DATED: 02/01/08

24      /s/ Gregory G. Hollows

                                            _____

25      GREGORY G. HOLLOWS

                                            UNITED STATES MAGISTRATE JUDGE

26  GGH:009 - mitc2321.mtd