1

2

3

4

5

6

7

8                  IN THE UNITED STATES DISTRICT COURT

9                  FOR THE EASTERN DISTRICT OF CALIFORNIA

10   ROBERT MITCHELL,

11              Plaintiff,                 No. CIV S-06-2321 GEB GGH P

12        vs.

13   D.G. ADAMS, et al.,                  <u>ORDER</u> &

14              Defendants.               <u>FINDINGS AND RECOMMENDATIONS</u>

15   _____/

16   <u>Introduction</u>

17   _____ Plaintiff, a state prisoner proceeding pro se, seeks relief pursuant to 42 U.S.C. §

18   1983.  Pending before the court are: 1) plaintiff's motion for partial summary judgment, filed on

19   November 24, 2009, to which defendants filed their opposition on December 28, 2009, to which

20   plaintiff filed his reply on January 29, 2010; 2) defendants' cross-motion for summary judgment,

21   filed on December 28, 2009,[1] to which plaintiff filed his opposition on January 29, 2010,[2] after

22

23   _____

24        [1] The court granted defendants' request for permission to file their cross-motion late.  See
     order, filed on January 6, 2010.

25        [2] Plaintiff's request for an extension of time to file his reply to defendants' opposition to
     his partial summary judgment motion and his opposition to the defendants' cross-motion was
26   granted by order, filed thereafter, on February 3, 2010.

which defendants filed their reply on March 15, 2010[3]; 3) plaintiff's motion for sanctions for

failing to file a timely opposition to plaintiff's November 24, 2009, motion for partial summary

judgment, filed on December 15, 2009 (docket # 76).

Plaintiff's Motion for Sanctions

        Regarding plaintiff's motion for sanctions for defendants' failure to file a timely

opposition to his motion for partial summary judgment, plaintiff is correct that the court had

stated in the order, filed on April 16, 2009 (docket # 68), wherein the discovery deadline was

extended until July 31, 2009, and the pretrial dispositive motion deadline re-set to November 30,

2009, that there would be no further extension.  Nevertheless, by order, filed on December 15,

2009 (docket # 75), preceding the entry in the case docket of plaintiff's motions for sanctions, the

court granted defendants an extension of time, until December 29, 2009, to file their opposition

to plaintiff's motion for partial summary judgment.  Defendants filed their opposition on

December 28, 2009, as well as a cross-motion for summary judgment.  By order, filed on January

6, 2010, the court permitted defendants to file the cross-motion beyond the dispositive motion

deadline, deeming it timely filed as well.  Thereafter, the court granted plaintiff's request for an

extension of time to file a reply to defendants' opposition to his motion for partial summary

judgment and also granted plaintiff additional time to file his opposition to the defendants' cross-

motion.  See order, filed on February 3, 2010 (docket # 92).  As noted in footnote 3, the court

subsequently permitted defendants extensions of time to file their reply.  As the undersigned had

already granted the request for an extension of time for defendants to file their opposition to

plaintiff's summary judgment motion, the court must deny plaintiff's motion for sanctions.

Summary of Complaint

        In accordance with the order, filed on February 4, 2008 (doc. # 29), the following

---

[3] Defendants were granted two extensions of time to file their reply to plaintiff's opposition to their cross-motion for summary judgment.  See orders, filed on February 23, 2010 (docket # 93) and on March 1, 2010 (docket # 96).

four of the twenty-nine defendants were voluntarily dismissed: Babich, Ingwerson, Lockard and C. Adams.  Pursuant to the March 3, 2008, order (docket # 34) adopting the findings and recommendations of Feb. 4, 2008, nine more defendants,[4] along with certain claims, were dismissed and the complaint now proceeds on plaintiff's claim for money damages only.

The defendants include Corcoran State Prison (CSP) employees: D. G. Adams, D.D. Ortiz, K. Daviega, J.A. Diaz, T. Galaviz, B. Streeter, P. Chatham, J. Hill, R. Hubach, A. Morrison, J. Diaz, S. Tellerico; and High Desert State Prison (HDSP) employees: D. Vanderville, B. Epperson, J. Owen, D. Hellwig.  Plaintiff was incarcerated at High Desert State Prison (HDSP) at the time of filing his complaint, on October 20, 2006.[5]  He alleges that defendants at both Corcoran State Prison (CSP) and HDSP violated his rights under the First and Fourteenth Amendments.

Defendants Adams, Ortiz, Daviega, J.A. Diaz, Galaviz, Streeter, Chatham, Hill, Hubach, Morrison, Diaz, and Tellerico at CSP, conspired together to transfer him to High Desert State Prison in retaliation for his filing grievances and to avoid responding to or returning his pending appeals and increased his security housing level and confiscated and destroyed his property in violation of his First Amendment rights.  The CSP defendants threatened to physically harm him and place him in ad seg if he did not withdraw his grievances, which he did out of fear in violation of his rights under the First Amendment.

 Defendants Vanderville, Epperson, Owen and Hellwig at High Desert State Prison (HDSP) all ratified the retaliatory conduct of the CSP defendants by refusing to take corrective measures and by increasing his security housing level, by confiscating and destroying plaintiff's personal and legal property, all at the request of the CSP defendants, in violation of plaintiff's First Amendment rights.

---

[4] Felker, McDonald, Billings, Gunter, Marshall, Harnden, McCraw, Wright, and Lynn.

[5] Plaintiff's most recent notice of change of address, filed on April 28, 2010, indicates that plaintiff is currently housed at Folsom State Prison.

1        Plaintiff alleges that all of the defendants "maintain segregationist policies,"

2  harboring a discriminatory animus against plaintiff and other African American inmates,

3  requiring them to be double celled only with African Americans, and in separate holding cells, a

4  claim of a violation of the Equal Protection Clause of the Fourteenth Amendment.  Plaintiff also

5  alleges a state tort claim of negligence, contending that defendants inflicted physical, mental and

6  emotional injuries upon him by their acts and omissions.  He claims that he has lost wages, legal

7  and personal property, and suffered "severe pain, humiliation, indignities...."  Plaintiff also

8  claims defendants' conduct was willful, wanton, malicious and oppressive.  Plaintiff seeks

9  compensatory and punitive damages and a declaratory judgment.  See Complaint, pp. 1-55.[6]

10 Motions for Summary Judgment

11       In reviewing plaintiff's motion for partial summary judgment and defendants'

12 cross-motion for summary judgment, as well as the respective oppositions and reply briefs, the

13 court notes at the outset that plaintiff has, since filing his motion for partial summary judgment,

14 sought to voluntarily dismiss defendants Streeter, Chatham and Galaviz with prejudice, pursuant

15 to Fed. R. Civ. P. 41(a)(2), as well as "only" his Fourteenth Amendment equal protection

16 segregated housing claim against defendants Adams, Morrison, Daviega, Hill and Hubach.  Opp.

17 to CMSJ, Doc. 87, pp. 2, 7.  In their reply, defendants note plaintiff's request for dismissal of

18 defendant Streeter and his Fourteenth Amendment equal protection claims against the

19 immediately preceding defendants.  Reply to CMSJ, pp. 2-3.  Although, due to an apparent

20 oversight, they do not specifically state that plaintiff also moved for dismissal of defendants

21 Chatham and Galaviz with prejudice as well, defendants do state "the court should dismiss the

22 claims that [plaintiff] concedes lack merit."  Id.  The undersigned, therefore construes that the

23 defendants and claims for which plaintiff has sought dismissal with prejudice have been

24 stipulated to as well by defendants and finds that the parties have agreed to the voluntary

25 _____

26     [6] Plaintiff's claims for injunctive relief were previously dismissed.  See order filed on March 3, 2008.

4

1  dismissal of these defendants and claims with prejudice under Fed. R. 41(a)(ii), and they will not

2  be further addressed within the pending motion and cross-motion.

3           As modified immediately above, plaintiff, therefore, brings his motion for partial

4  summary judgment (PMSJ) as to CSP defendant Morrison for violation of plaintiff's First

5  Amendment rights in the form of retaliation, violation of plaintiff's right to petition the

6  government for redress and his right to access the court; as to CSP defendants Ortiz, J.A. Diaz, J.

7  Diaz and Tellerico for violating plaintiff's Fourteenth Amendment right to equal protection by

8  their unconstitutional policy and practice of racial segregation; as to HDSP defendants

9  Vanderville, Owen and Hellwig for violating plaintiff's First Amendment rights by retaliating

10 against him with regard to housing; and as to all HDSP defendants, Vanderville, Epperson, Owen

11 and Hellwig, for violating plaintiff's Fourteenth Amendment right to equal protection by their

12 unconstitutional policy and practice of racial segregation.  PMSJ, pp. 2-3.

13          Also with the modification noted above, in their cross-motion for summary

14 judgment (CMSJ), defendants move for dismissal[7] of plaintiff's First Amendment claim against

15 defendant Morrison for destroying plaintiff's legal property because no harm resulted; of

16 plaintiff's Fourteenth Amendment claim against defendants because defendants did not subject

17 plaintiff to segregated housing; of plaintiff's First Amendment retaliation claims against

18 defendants for transferring him to HDSP and maintaining him in their 180-design housing

19 because legitimate correctional goals were thereby advanced.  CMSJ, Document 82-2, pp. 10-13.

20 Defendants also argue that they are entitled to qualified immunity, that the court should decline

21 supplemental jurisdiction of plaintiff's state law negligence claim and that the negligence claim

22 should be dismissed on the ground that defendants' conduct was reasonable.  Id., at 13-14.

23                    *Legal Standards for Summary Judgment*

24          Burdens on summary judgment motion differ depending on who will carry the

25 _____

26     [7] Defendants more accurately could have stated that they move for summary judgment,
   not dismissal.

burden of persuasion at trial.  With respect to plaintiff's motion for partial summary judgment,

"[a]s the party with the burden of persuasion at trial, the [moving party] must establish "beyond

controversy every essential element of its' [ ] claim. [The non-moving party] can defeat summary

judgment by demonstrating the evidence, taken as a whole, could lead a rational trier of fact to

find in its favor."  Southern California Gas Co. v. City of Santa Ana, 336 F.3d 885, 888 (9th Cir.

2003).

        As to defendants' cross-motion for summary judgment, summary judgment is

appropriate when it is demonstrated that there exists "no genuine issue as to any material fact and

that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).

> Under summary judgment practice, the moving party
> always bears the initial responsibility of informing the district court
> of the basis for its motion, and identifying those portions of "the
> pleadings, depositions, answers to interrogatories, and admissions
> on file, together with the affidavits, if any," which it believes
> demonstrate the absence of a genuine issue of material fact.

Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S. Ct. 2548, 2553 (1986) (quoting Fed. R. Civ.

P. 56(c)).  "[W]here the nonmoving party will bear the burden of proof at trial on a dispositive

issue, a summary judgment motion may properly be made in reliance solely on the 'pleadings,

depositions, answers to interrogatories, and admissions on file.'"  Id.  Indeed, summary judgment

should be entered, after adequate time for discovery and upon motion, against a party who fails to

make a showing sufficient to establish the existence of an element essential to that party's case,

and on which that party will bear the burden of proof at trial.  See id. at 322, 106 S. Ct. at 2552.

"[A] complete failure of proof concerning an essential element of the nonmoving party's case

necessarily renders all other facts immaterial."  Id.  In such a circumstance, summary judgment

should be granted, "so long as whatever is before the district court demonstrates that the standard

for entry of summary judgment, as set forth in Rule 56(c), is satisfied."  Id. at 323, 106 S. Ct. at

2553.

        If the moving party meets its initial responsibility, the burden then shifts to the

opposing party to establish that a genuine issue as to any material fact actually does exist.  See

Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S. Ct. 1348, 1356

(1986).  In attempting to establish the existence of this factual dispute, the opposing party may

not rely upon the allegations or denials of its pleadings but is required to tender evidence of

specific facts in the form of affidavits, and/or admissible discovery material, in support of its

contention that the dispute exists.  See Fed. R. Civ. P. 56(e); Matsushita, 475 U.S. at 586 n.11,

106 S. Ct. at 1356 n. 11.  The opposing party must demonstrate that the fact in contention is

material, i.e., a fact that might affect the outcome of the suit under the governing law, see

Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 2510 (1986); T.W. Elec.

Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987), and that the

dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the

nonmoving party, see Wool v. Tandem Computers, Inc., 818 F.2d 1433, 1436 (9th Cir. 1987).

        In the endeavor to establish the existence of a factual dispute, the opposing party

need not establish a material issue of fact conclusively in its favor.  It is sufficient that "the

claimed factual dispute be shown to require a jury or judge to resolve the parties' differing

versions of the truth at trial."  T.W. Elec. Serv., 809 F.2d at 631.  Thus, the "purpose of summary

judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a

genuine need for trial.'"  Matsushita, 475 U.S. at 587, 106 S. Ct. at 1356 (quoting Fed. R. Civ. P.

56(e) advisory committee's note on 1963 amendments).

        In resolving the summary judgment motion, the court examines the pleadings,

depositions, answers to interrogatories, and admissions on file, together with the affidavits, if

any.  Fed. R. Civ. P. 56(c).  The evidence of the opposing party is to be believed.  See Anderson,

477 U.S. at 255.  All reasonable inferences that may be drawn from the facts placed before the

court must be drawn in favor of the opposing party.  See Matsushita, 475 U.S. at 587, 106 S. Ct.

at 1356.  Nevertheless, inferences are not drawn out of the air, and it is the opposing party's

obligation to produce a factual predicate from which the inference may be drawn.  See Richards

1    v. Nielsen Freight Lines, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), aff'd, 810 F.2d 898, 902

2    (9th Cir. 1987).  Finally, to demonstrate a genuine issue, the opposing party "must do more than

3    simply show that there is some metaphysical doubt as to the material facts . . . .  Where the record

4    taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no

5    'genuine issue for trial.'"  Matsushita, 475 U.S. at 587, 106 S. Ct. at 1356 (citation omitted).

6                On December 13, 2006, and again on May 11, 2007, the court advised plaintiff of

7    the requirements for opposing a motion pursuant to Rule 56 of the Federal Rules of Civil

8    Procedure.  See Rand v. Rowland, 154 F.3d 952, 957 (9th Cir. 1998) (en banc); Klingele v.

9    Eikenberry, 849 F.2d 409, 411-12 (9th Cir. 1988).

10               There is no easy way to organize this motion which includes allegations involving

11   distinct constitutional claims against many defendants at two different institutions.  The best the

12   undersigned can do is to clearly delineate the organization chosen:

13   1. Plaintiff's motion for partial summary judgment – retaliation against defendant Morrison and

14   denial of right to court access as to Morrison;

15   2. Defendant Morrison's cross-motion on (1) above;

16   3. Fourteenth Amendment equal protection housing claims both as to plaintiff's motion and

17   defendants' cross-motion;

18   4. Plaintiff's retaliation in transfer motion against HDSP defendants;

19   5. CSP and HDSP defendants' cross-motion with respect to retaliatory transfer.

20                *Defendant Morrison*

21               Plaintiff makes the following specific allegations against defendant Morrison

22   within his verified complaint.  On November 12, 2005, defendant Morrison stopped plaintiff as

23   he carried envelopes with legal material, whereupon plaintiff told Morrison he was headed to the

24   law library to conduct legal research and to mail out his legal documents, showing Morrison the

25   documents.  Defendant Morrison snatched up the documents and tore them up, telling plaintiff he

26   could not have them.  Plaintiff explained that they had been sent to him by the state attorney

1 general's office and concerned a pending case of his and were not contraband.  Defendant

2 Morrison told plaintiff that the documents pertained to a lawsuit against correctional staff and

3 that they were "'FLSA' time sheets" that plaintiff could not have.  Plaintiff told defendant

4 Morrison that his having destroyed the documents sent by the attorney general's office before

5 plaintiff had had a chance to address appeal issues violated his First and Fourteenth Amendment

6 rights, to which Morrison replied that he did not care about plaintiff's rights, stating that since

7 plaintiff had arrived, inmates had started filing lawsuits and staff complaints had increased.

8 Complaint, pp. 22-23.  When defendant Morrison tore up the documents, plaintiff informed him

9 that he would file a complaint against him to which Morrison responded that he did not care

10 "because don't you know that correctional staff at Corcoran don't find other correctional staff

11 guilty of rule violations.  Nothing is going to happen." Id., at 24.

12       When defendant Hill asked defendant Morrison if plaintiff's version of events had

13 occurred as plaintiff told it, defendant Morrison stated "yes," and also said that he had told

14 plaintiff they were tired of him and his complaint filing.  When plaintiff told defendant Hill that

15 in light of Morrison's admission that plaintiff expected Hill to hold Morrison accountable to

16 departmental policy and procedure, defendant Hill "became enraged," approaching plaintiff with

17 a clenched fist and shouting, inter alia, "I don't give a rat's ass about you or your complaints.

18 We run this fucking yard the way we see fit and we don't have to answer to anyone.  Now, I'm

19 telling you to drop your complaints, if you know what's good for you." Id., at 24-25.

20       Defendant Morrison then threatened plaintiff with a "blanket party," saying "if

21 you keep on snitching and filing complaints, we're going to come an[d] pay your ass a visit

22 dressed all in black and snatch your ass out of your cell at 2 or 3 o'clock in the morning and beat

23 your ass!  We've done this shit before and we'll do your ass too!"  Both defendants laughed and

24 warned plaintiff to drop grievances nos. CSPC-3-06-00115 and CSPC -3-06-00652, and were

25 heard by unidentified inmates and correctional staff.  The next day, Feb. 23, 2006, plaintiff filed

26 a complaint against defendants Hill and Morrison for the incident of Feb. 22, 2006, no. CSPC-3-

9

6-01022.  Id., at 25-26.

Plaintiff contends that he is entitled to summary judgment on his claims that this defendant violated his First Amendment rights by retaliating against him for the filing of grievances, and violating his right to petition the government for redress and right to access the court by destruction of certain of plaintiff's legal documents.   Plaintiff's Motion for Partial Summary Judgment (PMSJ), pp. 8-13, 16, 26-37.

Defendants posit five objections to plaintiff's evidence in support of his PMSJ: 1) that plaintiff has stated facts in his points and authorities that he has omitted from his separate statement in violation of Local Rule (L.R.) 56-260(a) (now, simply, L.R. 260(a))[8]; 2) that plaintiff has cited his declaration in support of his 36 undisputed material facts without referencing page, line or paragraph numbers, again not in compliance with L.R. 260(a); 3) that the statements plaintiff includes in his declaration purportedly by defendants Adams, Ortiz and Daviega relayed to plaintiff by other defendants are inadmissible hearsay;[9] 4) that plaintiff mischaracterizes defendants' discovery responses as admissions in support of the following PSUF 8-13; 18-25; 27-36; 5) that plaintiff's Ex. A, Appeal Log n. CSP-03-06-00652, First Level Appeal Response, and particularly the inmate request for interview, verifying that Correctional Officer S.G. Vasquez gave plaintiff's 602-appeal to defendant Morrison on 12/7/06 and gave him until 12/14/05 to issue an informal level response, cited in support of PSUF 1-6, on grounds of hearsay.  See defendants' objections to plaintiff's evidence in support of PMSJ, Doc. # 79.

In response, plaintiff maintains that he has enumerated his separate statement of undisputed facts accurately, or at least for an incarcerated pro se litigant, adequately; that defendants are posing objections to divert attention from a lack of evidence they proffer; that

---

[8] Although defendants cite L.R. 56-260(a) more than once in their objections, as currently the Local Rules have been amended, the court will refer to L.R. 260(a).

[9] As plaintiff points out in his reply to this objection and objection 5, defendants cite an inaccurate (non-existent) Fed. R. Evid. in support of this objection, identifying it as Fed. R. Evid. 810.  The appropriate rules are Fed. R. Evid. 801(c) and 802.

statements attributed to certain defendants by other defendants are not inadmissible hearsay but statements made by co-conspirators (Fed. R. Evid. 801(d)(2)(E)).  Plaintiff's response to defendants' objections to plaintiff's evidence in support of PMSJ.  Plaintiff counters that under Fed. R. Evid. 301 he is not mischaracterizing defendants' discovery responses, but merely simply applying a presumption based on the responses which defendants must produce evidence to rebut.  Id.  Finally, as to C/O Vasquez alleged statement, plaintiff argues that her statement is not hearsay because it meets the factors set forth under Fed. R. Evid. 807.  Id.

As to defendants' objection that plaintiff does not point to any specific portion of his declaration in support of a number of his putative undisputed facts, defendants are correct that plaintiff has simply failed to comply with the requirement under L.R. 260(a) to "cite the *particular* portions of any pleading, affidavit, deposition, interrogatory answer, admission, or other document relied upon to establish" and undisputed fact. [Emphasis added].  Plaintiff's effort to rectify this deficiency by placing the specific citations within his response to defendants' statement of disputed and undisputed facts is simply too late to have provided any help to defendants in trying to formulate their response to the motion's initial statement of undisputed facts.  However, plaintiff did make an effort in the original statement to explicitly set forth the other documentary evidence he relied on in his statement of undisputed facts.  To the extent, nevertheless, that plaintiff includes within his points and authorities allegations that he has not provided evidentiary support for in his separate statement of undisputed facts in support of PMSJ, defendants' objection is well-taken and is sustained, although the court will consider statements not referenced therein that he makes in his declaration(s).  Also, objections to evidence that could be made admissible at trial may be considered on summary judgment.  See Fraser v. Goodale, 342 F.3d 1032, 1036 (9th Cir. 2003) (evidence which could be made admissible at trial may be considered on summary judgment); see also Aholelei v. Hawaii

\\\\\

\\\\\

11

1   Dept.of Public Safety, 220 Fed. Appx. 670 (9th Cir. 2007).[10]

2           Plaintiff in his statement of undisputed facts asserts in PSUF 1 that on November

3   12, 2005, his legal documents, consisting of 602-staff complaints and FLSA[11] time sheets, were

4   confiscated and subsequently destroyed by defendant Morrison.  In plaintiff's undisputed fact 2,

5   plaintiff asserts that he submitted a 602 appeal regarding defendant Morrison's actions, and that

6   on December 7, 2005, C/O S. G. Vasquez personally gave plaintiff's appeal to defendant

7   Morrison for an informal level response pursuant to CAL. CODE REGS. tit.xv, § 3084.5, and gave him

8   until December 14, 2005, to issue the response.  In support of these facts, plaintiff relies on his

9   own declaration (pages 5-8[12]) in support of his PMSJ and his Ex. A to that declaration, a copy of

10  his 602 appeal, Log No. CSP-06-0652 and the first formal level appeal response, along with a

11  copy of plaintiff's request for interview ("verifying that [] Vasquez gave plaintiff's 602-appeal to

12  to defendant Morrison on December 7, 2005 and gave him until December 14, 2005, to issue an

13  informal level response"), as well as a copy of CAL. CODE REGS. tit.xv, § 3084.5(a)(1)(2).  The Nov.

14  12, 2005, appeal states that plaintiff had shown the confidential legal documents defendant

15  Morrison had confiscated had been sent to plaintiff by Deputy Attorney General Terrence Sheehy

16  of the Attorney General's Office and that plaintiff had shown defendant Morrison verification

17  that the documents had been provided to him and that he was permitted to have them.  Although

18  it appears that plaintiff dated the original appeal 11/12/05, he identifies in his January 23, 2006,

19  request for interview regarding the status of the appeal as having been filed on 11/22/05.  In any

20  event in the portion of the request form under "disposition," and signed "C/O Vasquez," it is

21

22          [10] It is unclear to the undersigned what rules of procedure on summary judgment are
applicable to litigants appearing pro se.  See Richardson v. Runnels, 594 F.3d 666 (9th Cir.
23  2010), a case in which the pro se plaintiff not only failed to supply documents required by the
local rules, but more importantly, failed to tender any evidence on the facts he desired to
24  controvert.  However, these deficiencies were not important to the Richardson court.

25          [11] Fair Labor Standards Act.

26          [12] This section of the declaration is only identified among the reply papers.

stated: "[o]n 12-07-05 a 602 regarding staff complaint was routed [sic] Sgt. Morrison it was assigned date of 12-14-05."  See docket # 72, pp. 1-2; docket # 73, plaintiff's Dec. pp. 5-8; Ex. A, pp. 23-25; Ex. B, pp. 28-29.

In addition to positing their second and fifth objections noted above, defendants cite in their response to plaintiff's undisputed facts 1 and 2, ¶¶ 3-5 of defendant Morrison's declaration in Ex. A of their evidence in opposition to the PMSJ (and in support of their own MSJ).  Docket # 80, defendants' response to PUF, p. 2.  In his declaration, defendant Morrison avers that he was summoned by a yard officer to plaintiff's location on or about Nov. 12, 2005, who had conducted a body search of plaintiff as is customary when inmates are being released to the yard, and found the FLSA timesheet documentation, dated December 21, year unknown, with a staff name, position, pay number, and signatures on it.  See docket # 81-2, Ex. A, Defendant Morrison's Dec. in support of defendants' opp. to PMSJ, ¶ 3.  Defendant Morrison states that he told plaintiff he was going to keep the FLSA documentation pending an investigation as to whether plaintiff could have it in his possession.  Id., at ¶ 4.  He declares that he was told by the litigation department that plaintiff could only have FLSA timesheet copies pertaining to his case number.  Id.  Defendant Morrison declares that the date of the FLSA documentation did not correspond to plaintiff's court case and that he so notified plaintiff that day and also informed him that he was going to destroy the FLSA documents.  Id.  Defendant Morrison denies having told plaintiff that he could not have 602 appeals or FLSA time sheets or other documents pertaining to a lawsuit against correctional staff and denies having torn up documents in plaintiff's presence and denies having told plaintiff that since plaintiff's arrival, filings of lawsuits and complaints against staff had increased.  Id., at ¶ 5.

Only one of plaintiff's undisputed facts, relevant to his claims against defendant Morrison (PUF) is, in fact, expressly undisputed by defendants: PSUF[13] 4: on January 27, 2006,

---

[13] Plaintiff's statement of undisputed facts in support of plaintiff's PMSJ.

1   approximately 4 days after [plaintiff's] inquiring about the status of the 602-appeal, defendant

2   Morrison issued an informal level response: "(a) that he received plaintiff's 602-appeal on

3   January 27, 2006 and (b) denied plaintiff's 602-appeal pursuant to CCR tit. 15 sec. 3084.6(c)

4   appeal time limits."   PSUF, p. 4; DSD&UF,[14] p. 3.

5           In plaintiff's undisputed fact 5, he states that on January 27, 2006, after he had

6   received defendant Morrison's informal level response and realizing that defendant Morrison was

7   not being truthful regarding the date he actually received plaintiff's 602-appeal from C/O

8   Vasquez, plaintiff contacted Vasquez, informing her of defendant Morrison's allegations.  C/O

9   Vasquez filled out the January 23, 2006, request for interview stating that the 602 appeal had

10  been given to Sgt. Morrison on 12/7/05, with an assigned due date of 12/14/05.  C/O Vasquez

11  then told plaintiff to fill out the formal level of the 602 appeal, attaching the inmate request for

12  interview, explaining that Morrison was not being truthful.  Plaintiff was also told by C/O

13  Vasquez that she would contact the inmate appeals coordinator and explain about Morrison not

14  being truthful.  On January 27, 2006, plaintiff filled out section D of the formal level, stating:

15  "Sgt. Morrison is not telling the truth, C/O S.G. Vasquez 3B Education Officer personally gave

16  Sgt. Morrison my 602 on 12/7/05 and gave him a due [date] of 12/14/05.  See attachment page

17  #2.  This verifies that Sgt. Morrison got my 602 on 12/7/05 not 1/27/06.  Sgt. Morrison withheld

18  my 602 pass [sic] its due date to keep from answering it.  I want my legal papers back."   In

19  support of PUF 5, plaintiff again relies on his declaration (pages 5-8) in support of his PMSJ and

20  his Ex. A to that declaration, a copy of his 602 appeal, Log No. CSP-06-0652 and the first formal

21  level appeal response, along with a copy of plaintiff's request for interview ("verifying that []

22  Vasquez gave plaintiff's 602-appeal to to defendant Morrison on December 7, 2005 and gave

23  him until December 14, 2005, to issue an informal level response").

24           Defendant Morrison disputes this fact with his declaration at ¶ 6, and objects

25

26       [14] Defendants' statement of disputed and undisputed facts in opposition to PMSJ.

again with reference to defendants' objections 2 and 5, pointing out, in addition, that plaintiff's

declaration does not mention plaintiff's interactions and conversations with regard to the

grievance.  Docket # 80, defendants' response to PUF, p. 4.  In his declaration, defendant

Morrison swears that he did not hold plaintiff's grievance relating to the FLSA documentation so

that plaintiff's time limits for filing would be exceeded and further declares that he was not

aware of plaintiff's grievance concerning that documentation until, as he maintains, he received it

on January 27, 2006.   Docket # 81-2, Morrison's Dec. in support of defendants' opp. to PMSJ, ¶

6.

In PUF 6, plaintiff states that after the inmate appeals coordinator spoke with C/O

S.G. Vasquez and confirmed that defendant Morrison was not being truthful, plaintiff's

602-appeal was given a log no. CSP-03-06-06452 and was immediately processed.  On February

22, 2006 approximately 100 days after plaintiff had submitted his 602-appeal Log No.

C.S.P.-03-06-0652, he was interviewed by defendant Correctional Lieutenant Hill. After the

hearing, plaintiff's 602 appeal Log No. C.S.P.-03-06-0652, was partially granted and defendant

Morrison was found to have confiscated and destroyed plaintiff's legal documents in violation of

C.S.P.-Operational Procedure No. 202, Paragraph VII Destruction of Evidence and

CDC-Operations Manual Section 52051.15, which requires that all information, property, and

evidence confiscated by correctional staff shall be retained for "at least 6 months," before being

prepared for destruction or returned.  Plaintiff relies once more on his declaration in support of

his PMSJ and his Ex. A to that declaration, a copy of his 602 appeal, Log No. CSP-06-0652 and

the first formal level appeal response, along with a copy of plaintiff's request for interview

("verifying that [] Vasquez gave plaintiff's 602-appeal to to defendant Morrison on December 7,

2005 and gave him until December 14, 2005, to issue an informal level response"); he also cites

a copy of C.S.P. Operational Procedure No. 202 Control of Evidence; and copy of CDC

Operational Manual Section 52051.15 Handling of Evidence.

1    In disputing PUF 6, defendants (Docket # 80,[15] p. 5 ) cite Ex. A, Docket # 81-2,

2    defendant Morrison's Dec. in support of defendants' Opp. to PMSJ, ¶¶ 3-6, and their Objections

3    2 and 5.  They further maintain that plaintiff's declaration does not mention the appeals

4    coordinator's alleged confirmation of Morrison's untruthfulness and that plaintiff misstates

5    defendant Hill's appeal response, inasmuch defendant Hill's grievance response does not state

6    that defendant Morrison confiscated and destroyed plaintiff's legal documents in violation of

7    C.S.P.-Operational Procedure No. 202, Paragraph VII Destruction of Evidence and

8    CDC-Operations Manual Section 52051.15, which requires that all information, property, and

9    evidence confiscated by correctional staff shall be retained for "at least 6 months," before being

10   prepared for destruction or returned.  Defendants aver that plaintiff lacks foundation to testify

11   about Morrison's alleged violation of C.S.P. Operational Procedure No. 202 Control of

12   Evidence; and CDC Operational Manual Section 52051.15 Handling of Evidence.  Docket # 80,

13   p. 5.

14   Defendant Hill's first formal level appeal response on the partially granted

15   February 22, 2006 CSP-3-06-652 grievance states in relevant part:

16   **Findings**:

17   On February 22, 2006, Correctional Sergeant A. Morrison was
     interviewed regarding your allegations.  Sergeant Morrison stated
18   the papers confiscated that consisted of Fair Labor Standard [sic]
     Act documents, (staff sign in sheets) were dated November 24,
19   2004.  The dates you provided as received from the Attorney's
     General [sic] Office, did not include the date of the documentation
20   confiscated.  I also asked if you were given a receipt of the items
     confiscated and you said no.  Furthermore, may [sic] interview
21   with staff reveals that a receipt was not provided.

22   **Appeal Decision**:
     After a review of all available information, your requested actions
23   at the First Formal Level is [sic] **PARTIALLY GRANTED,**
     granting no retaliation for filing this inmate appeal, training is
24   ongoing with all staff regarding staff and inmates [sic] relations.

25   ───────────────────

26   [15] Defendants' Statement of Disputed and Undisputed Facts in support of Opposition to
     PMSJ.

1       The confiscated documents were held for approximately thirty
     days, pending a response and subsequently disposed of per
2       institutional procedures.

3  PMSJ, docket # 73, plaintiff's Dec., Ex. A, p. 24.

4          In his response to defendants' assertion that the fact is disputed, plaintiff

5  breaks down his undisputed fact 6 in a fashion which he should have used in setting such facts

6  forth at the outset.   He correctly points out that defendant Morrison has not disputed the fact that

7  plaintiff's 602-appeal was given a log no. CSP-03-06-0652 and was immediately processed,

8  although he is incorrect that he has provided sufficient evidence to demonstrate that this occurred

9  following the appeals coordinator having spoken with C/O Vasquez.  Docket # 88, p. 8.  Plaintiff

10  is also correct that defendant Morrison has not shown there is a dispute that, on February 22,

11  2006, approximately 100 days after plaintiff had submitted his 602-appeal Log No.

12  C.S.P.-03-06-0652, he was interviewed by defendant Correctional Lieutenant Hill and that after

13  the hearing, plaintiff's 602 appeal Log No. C.S.P.-03-06-0652, was partially granted.  Id.  But

14  plaintiff does not set forth sufficient evidentiary support for his assertion that the appeals

15  coordinator confirmed defendant Morrison's untruthfulness with C/O Vasquez.

16          Plaintiff argues that it is the discovery produced to him by defendants that shows

17  that defendant Morrison violated certain prison procedures in confiscating and destroying

18  plaintiff's legal documents.  Docket # 88, pp. 8-13.  However, in plaintiff's purported undisputed

19  fact 6, plaintiff contends that Morrison was expressly found to have violated C.S.P.-Operational

20  Procedure No. 202, Paragraph VII Destruction of Evidence and CDC-Operations Manual Section

21  52051.15, but defendants accurately maintain that this is not what is contained within the appeal

22  response.  It may be that by reliance on the procedures he cites that plaintiff can argue that

23  defendant Morrison violated those procedures, asserting that defendant Hill's response is not

24  logical because he says the documents were destroyed within thirty days of having been

25  confiscated but the interview did not occur until some 100 days after the initial filing of

26  plaintiff's grievance.  But when the interview was held does not mean that the appeal response

17

1   cannot recount the history of when the documents were destroyed.   Plaintiff argues that there is

2   no dispute that he was not provided with a receipt for the documentation confiscated by

3   defendant Morrison, and this appears to be substantiated by the grievance response.   Plaintiff

4   believes he is justified in inferring that defendant Morrison was found to have destroyed his

5   documentation in violation of operational procedure because defendants produced documents to

6   him which indicate that.   But defendants are correct in stating that plaintiff has not set forth the

7   basis for his conclusion that the procedures referenced apply in this context or that defendant Hill

8   tried to cover it up.   Plaintiff further contends that defendants simply fail to rebut the evidence

9   he produced.   But defendant Morrison flatly denies, under oath, that he delayed processing

10  plaintiff's appeal, etc.   It is not for this court to make a credibility determination on a motion for

11  summary judgment.   Dominguez-Curry v. Nevada Transp. Dept., 424 F.3d 1027, 1036 (9th Cir.

12  2005) ("[I]t is axiomatic that disputes about material facts and credibility determinations must be

13  resolved at trial, not on summary judgment.") [internal citation omitted].

14          Plaintiff, as noted, in addition to moving for summary judgment against defendant

15  Morrison on his First Amendment claims that defendant Morrison, in confiscating and destroying

16  his legal documents, was retaliating against plaintiff for having filed grievances, also maintains

17  that defendant Morrison denied him his right of access to the courts by destruction of the FLSA

18  and 602-appeals concerning staff complaints in his case, Mitchell v. Villa, Case No. 03cv1157

19  WQH (POR), which caused him to miss a filing deadline leading to dismissal of his case.   PMSJ,

20  pp. 28-37.

21              *Retaliation Claims Legal Standard*

22          Retaliation by prison officials for the exercise of a prisoner's constitutional right

23  of access to the courts violates the federal constitution.   Pratt v. Rowland, 65 F.3d 802, 807 (9th

24  Cir. 1995); Schroeder v. McDonald, 55 F.3d 454, 461 (9th Cir. 1995); Black v. Lane, 22 F.3d

25  1395, 1402 (7th Cir. 1994); Woods v. Smith, 60 F.3d 1161, 1164 (5th Cir. 1995); Rizzo v.

26  Dawson, 778 F.2d 527, 532 (9th Cir. 1985).   The Ninth Circuit treats the right to file a prison

grievance as a constitutionally protected First Amendment right.   Hines v. Gomez, 108 F.3d 265 (9th Cir. 1997); see also Hines v. Gomez, 853 F. Supp. 329 (N.D. Cal. 1994) (finding that the right to utilize a prison grievance procedure is a constitutionally protected right, cited with approval in Bradley v. Hall, 64 F.3d 1276, 1279 (9th Cir. 1995)); Graham v. Henderson, 89 F.3d 75 (2nd Cir. 1996) (retaliation for pursing a grievance violates the right to petition government for redress of grievances as guaranteed by the First and Fourteenth Amendments); Sprouse v. Babcock, 870 F.2d 450, 452 (8th Cir. 1989) (filing disciplinary actionable if done in retaliation for filing inmate grievances); Franco v. Kelly, 854 F.2d 584, 589 (2nd Cir. 1988) ("Intentional obstruction of a prisoner's right to seek redress of grievances is precisely the sort of oppression that section 1983 is intended to remedy" (alterations and citation omitted)); Cale v. Johnson, 861 F.2d 943 (6th Cir. 1988) (false disciplinary filed in retaliation for complaint about food actionable).

In order to state a retaliation claim, a plaintiff must plead facts which suggest that retaliation for the exercise of protected conduct was the "substantial" or "motivating" factor behind the defendant's conduct.  See Soranno's Gasco, Inc. v. Morgan, 874 F.2d 1310, 1314 (9th Cir. 1989).  The plaintiff must also plead facts which suggest an absence of legitimate correctional goals for the conduct he contends was retaliatory.  Pratt at 806 (citing Rizzo at 532). Verbal harassment alone is insufficient to state a claim.  See Oltarzewski v. Ruggiero, 830 F.2d 136, 139 (9th Cir. 1987).  However, even threats of bodily injury are insufficient to state a claim, because a mere naked threat is not the equivalent of doing the act itself.  See Gaut v. Sunn, 810 F.2d 923, 925 (9th Cir. 1987).  Mere conclusions of hypothetical retaliation will not suffice, a prisoner must "allege specific facts showing retaliation because of the exercise of the prisoner's constitutional rights."  Frazier v. Dubois, 922 F.2d 560, 562 (n. 1) (10th Cir. 1990).

This is not to say that a vexatious grievance filer can never be punished. Vexatious litigants may be the subject of court discipline, and the undersigned would find it incongruous that while the courts can punish vexatious filings, prison officials may not.  Indeed,

the right to petition for grievances is not absolutely protected; such a right has no greater

protection than speech in general.  Rendish v. City of Tacoma, 123 F.3d 1216 (9th Cir. 1997).  In

the prison context, one's free speech rights are more constricted from what they would be on the

outside.  O'Lone v. Estate of Shabazz, 482 U.S. 342, 107 S. Ct. 2400 (1987).  However, like

court procedures for disciplinary vexatious litigants, a modicum of due process must be

employed before punishment.  Again, plaintiff must show that the actions or omissions

constituting the "retaliation" served no legitimate penological goal.

### *Access to the Courts*

Plaintiff has not met the requisite "actual injury" necessary to support a claim for

denial of access to the courts under the First Amendment.  Lewis v. Casey, 518 U.S. 343, 351-53,

355, 116 S. Ct. 2174 (1996) (prisoner must allege actual injury).  The court held that before a

denial of access to the courts claim can go forward, an inmate must "demonstrate that a

nonfrivolous legal claim had been frustrated or was being impeded."  Id.  Accordingly, before a

claim of denial of access to the courts can proceed, an inmate must demonstrate that he was

precluded or thwarted in his efforts to present a legally or factually arguable claim to the courts.

Plaintiff has failed to do so in this instance.

"Under the First and Fourteenth Amendments to the Constitution, state prisoners

have a right of access to the courts.  Lewis v. Casey, 518 U.S. 343, 346, 116 S.Ct. 2174, 135

L.Ed.2d 606 (1996).  "[A]ccess to the courts means the opportunity to prepare, serve and file

whatever pleadings or other documents are necessary or appropriate in order to commence or

prosecute court proceedings affecting one's personal liberty."  Id. at 384, 116 S.Ct. 2174 (quoting

Hatfield v. Bailleaux, 290 F.2d 632, 637 (9th Cir.1961)).  This right "requires prison authorities

to assist inmates in the preparation and filing of meaningful legal papers by providing prisoners

with adequate law libraries or adequate assistance from persons trained in the law."  Bounds v.

Smith, 430 U.S. 817, 828, 97 S.Ct. 1491, 52 L.Ed.2d 72 (1977)."  Phillips v. Hust, 477 F.3d

1070, 1075-76 (9th Cir. 2007).

1       *Resolution*

2              While plaintiff's evidence does raise a question of the propriety of the manner in

3    which defendant Morrison destroyed the FLSA sheets and other documents he confiscated from

4    plaintiff, the material issue that remains in dispute is whether defendant Morrison acted in

5    retaliation for plaintiff's filing of grievances and as to whether or not plaintiff was deprived

6    thereby of his right of court access, the right of access to the courts being an issue for which he

7    does not set forth any fact as undisputed in his partial motion for summary judgment.  Nor does

8    plaintiff produce evidence demonstrating that the case he references, Mitchell v. Villa, was

9    dismissed due to defendant Morrison's actions.  Plaintiff's motion for partial summary judgment

10   as to defendant Morrison should be denied.

11              *Defendant Morrison's Cross-Motion for Summary Judgment*

12              In the cross-motion, defendant Morrison contends that plaintiff's First

13   Amendment claim against him fails because any destruction of plaintiff's legal property did not

14   harm plaintiff.  Defendants' Cross-Motion for Summary Judgment (CMSJ), Docket # 82-2, p. 6.

15   Defendant Morrison contends that it is undisputed that he (Morrison) did not retaliate against the

16   plaintiff.  CMSJ, DUF no. 28, Doc. # 82-1, citing Doc. # 81-1, Defs. Ex. A, Morrison Dec., ¶ 8.

17   Defendant Morrison further contends that he, along with all other defendants, is entitled to

18   qualified immunity.  (CMSJ), Docket # 82-2, p. 6.

19              *Defendant Morrison's Undisputed Facts*

20              Counsel sets forth the following as undisputed facts as to defendant Morrison. 1.

21   Plaintiff alleges that defendant Morrison confiscated Fair Labor Standards Act (FLSA) time

22   sheets and other legal documents from him and destroyed them, for which they cite plaintiff's

23   complaint at 22:14-23:5.  Defendants' Statement of Undisputed Facts (DUF) in Support of

24   Cross-Motion for Summary Judgment (CMSJ) (hereafter, DUF), Docket # 82-2, p. 18.  2.

25   Plaintiff alleges that defendant Morrison's destruction of his legal property caused his case,

26   Mitchell v. Villa, Case No. 03-CV-1157 WQH (POR), to be dismissed, citing PMSJ 33:1-6.  Id.

3. On March 7, 2007, the court dismissed <u>Mitchell v. Villa</u> because plaintiff had failed to exhaust his administrative remedies before filing suit on June 11, 2003, citing CMSJ, Ex. Q, Order dismissing <u>Mitchell v. Villa</u>, 5:20-8:3.  Id.

As to DSUF 1, plaintiff disputes only what he characterizes as the "vague and unspecific" characterization of the term "other legal documents."  Plaintiff's Statement of Disputed and Undisputed Facts (PD&UF) in Support of his Opp. to defendants' CMSJ, Docket # 89, p. 2.   However, within the allegations of the complaint cited by defendants, plaintiff specifically referred only to FLSA time sheets sent to him by the state Attorney General.  Nevertheless, plaintiff cites his declaration at 3:1-25 and defendants' Ex. A, Morrison Dec., in support of his contention that the documentation seized included both 602-appeal staff complaints and FLSA time sheets.  The court has located within his declaration in support of his PMSJ, docket # 73, p. 6 (and not where plaintiff has cited), plaintiff's statement that defendant Morrison told him that the documents "pertained to a lawsuit against correctional staff and that they were 602-appeals staff complaints and 'FLSA' time sheets that I could not have."  The reference within defendant Morrison's own declaration is also indirect: "I did not tell Mitchell that he could not have 602 appeals, FLSA time sheets, or other documents pertaining to a lawsuit against correctional staff."  Defendant Morrison's Dec., Docket # 81-2, ¶ 5.

With regard to DSUF 2, plaintiff contends that again defendants are being too vague in describing the documentation seized by not identifying the 602 staff complaint grievances pertaining to his <u>Mitchell v. Villa</u> case.  Docket # 89, p. 2.  Plaintiff does, indeed, state within his own motion for partial summary judgment that the documents he contends were improperly confiscated and destroyed by defendant Morrison included 602 appeals, but plaintiff never provides information as to how these appeals would have shown administrative exhaustion of the claims at issue in <u>Mitchell v. Villa</u>. Further, defendants have produced the order wherein defendant Villa's January 4, 2007, motion to dismiss plaintiff's complaint for failure to file an administrative claim alleging retaliation against plaintiff for filing complaints by informing

1  inmate gang members plaintiff was a snitch was granted; the court therein notes that plaintiff

2  filed no response to either the motion or to a subsequent <u>Rand</u> notice that the court had served

3  upon plaintiff on February 5, 2007.  See defendants' evidence in support of MSJ, Docket # 81-

4  17, Ex. Q (and Ex. Q to Reply, Docket # 97).  After analyzing the claim and the evidence, the

5  court, on March 7, 2007, dismissed the action without prejudice.  Id.

6         Plaintiff fails altogether to demonstrate why he omitted to file any opposition to

7  the motion in <u>Mitchell v. Villa</u> in February or March of 2007, concerning the confiscation and

8  destruction of evidence that he says could have saved that case which occurred in November of

9  2005.  Defendants note that while plaintiff contends that the documents destroyed by defendant

10 Morrison were produced to plaintiff by the Attorney General's Office during discovery in the

11 <u>Mitchell v. Villa</u> case, plaintiff does not produce any admissible evidence showing that the

12 grievances were destroyed or how they could have altered the outcome of that case and moreover

13 that plaintiff had filed grievances in support of his opposition to his opposition to the summary

14 judgment motion in that case on May 11, 2006 (adjudicated prior to the previously discussed

15 motion to dismiss).  Reply to Opp. to CMSJ, p. 3, Doc. # 97, citing defs. Ex. R, Declaration of G.

16 Michael German.

17        While it would appear to be patently unfair to burden plaintiff with producing

18 evidence that had been destroyed, plaintiff fails herein to demonstrate how the grievances he says

19 were destroyed showed administrative exhaustion of his claim in that case.   Moreover, Deputy

20 Attorney General German declares that he was assigned to represent defendant Villa in <u>Mitchell</u>

21 <u>v. Villa</u>, that he prepared the discovery responses to plaintiff's document requests in that case,

22 that based on his review and recollection, he did not produce any inmate grievances to plaintiff in

23 <u>Mitchell v. Villa</u>.  Reply, Docket # 97, Ex. R.  Defendants produce a duplicate of the grievances

24 apparently attached to plaintiff's declaration in support of his opposition to the summary

25 judgment motion in <u>Mitchell v. Villa</u>, (which motion preceded the motion to dismiss for failure

26 to exhaust administrative remedies), supporting the averment that no inmate grievances were

1  produced to plaintiff in that case from defendant Villa.  Id., pp. 41-55.  Moreover, defendants

2  produce a copy of grievances plaintiff filed on May 11, 2006, in support of his opposition to the

3  summary judgment motion in Mitchell v. Villa (which preceded the motion to dismiss for failure

4  to exhaust administrative remedies against Villa in that case).  Reply, Docket # 97, pp. 41-55.

5          Therefore, as to plaintiff's First Amendment claim against defendant Morrison

6  regarding a denial of his right of access to the courts, defendant Morrison is entitled to summary

7  judgment.  However, as to plaintiff's claim of retaliation by defendant Morrison for plaintiff's

8  having filed grievances/complaints in the manner of Morrison's confiscation and destruction of

9  the plaintiff's documents on November 12, 2005, genuine issues of material fact remain in

10  dispute.  This is not to say that defendants could not find plaintiff to have been a vexatious filer

11  based on his having filed an allegedly excessive number of complaints, but in order to do so they

12  must have demonstrated that an appropriate procedure was followed, not simply, as plaintiff

13  maintains, punish him arbitrarily for filing grievances.  As to the contention that defendant

14  Morrison is entitled to qualified immunity on plaintiff's First Amendment claims because

15  defendant Morrison did not violate plaintiff's constitutional rights and a reasonable officer would

16  consider the actions taken by this defendant to be lawful inasmuch as they advanced legitimate

17  goals of housing and institutional efficiency (CMSJ, Doc. 82-2, p. 13), the court finds that

18  defendant Morrison is not entitled to summary judgment on the remaining retaliation claim

19  against him.

20          In resolving a claim for qualified immunity the court addresses two questions: (1)

21  whether the facts, when taken in the light most favorable to plaintiff, demonstrate that the

22  officer's actions violated a constitutional right and (2) whether a reasonable officer could have

23  believed that his conduct was lawful, in light of clearly established law and the information the

24  officer possessed.  Anderson v. Creighton, 483 U.S. 635, 107 S.Ct. 3034 (1987).  Although the

25  Supreme Court at one time mandated that lower courts consider these two questions in the order

26  just presented, more recently the Supreme Court announced that it is within the lower courts'

discretion to address these questions in the order that makes the most sense given the circumstances of the case.  Pearson v. Callahan, --- U.S. ---, 129 S. Ct. 808 (2009).

The undersigned first considers the first qualified immunity prong, i.e. whether the facts, taken in the light most favorable to plaintiff, demonstrate that the defendant violated his constitutional rights.  The facts in the light most favorable to plaintiff, that defendant Morrison confiscated and destroyed legal documentation of plaintiff's without conforming to prison regulations and in retaliation for plaintiff's prior grievances and civil complaints and proceeded to hold his plaintiff's timely grievance about those actions until the time when he could reject the grievance based on its untimeliness demonstrate a violation of plaintiff's constitutional rights. Nor could a reasonable officer in light of clearly established law and information defendant Morrison possessed have believed such conduct to be lawful.  This matter should proceed on plaintiff's claim of retaliation for the filing of grievances by defendant Morrison.

### Defendants Ortiz, J.A. Diaz, J. Diaz and Tellerico -CSP & Defendants Vanderville, Epperson,  Owen and Hellwig-HDSP

In his verified complaint (as subsequently modified), plaintiff contends that his conflict with defendants Ortiz, J.A. Diaz, J. Diaz and S. Tellerico started following his arrival at CSP on December 17, 2004, and continued until March 21, 2006.  Complaint at 17.

On December 6, 2005, plaintiff submitted a grievance to the above-named defendants, alleging discrimination against African American inmates in compelling them, including plaintiff, to double cell with African American prisoners only, forcing non-affiliated African American inmates, including plaintiff, to double cell with those who participated in active inmate gangs and by punishing plaintiff and other non-gang affiliated African American inmates for serious rule violations committed by the gang participants.  Id.

On December 21, 2005, plaintiff was interviewed by defendant J.A. Diaz, regarding the Dec. 6, 2005, grievance, who stated: "Mitchell, your ass is still here!  I'm going to see to it that your ass gets transferred out of Corcoran because we're tired of you filing

1   complaints." He went on to tell plaintiff that defendant Warden D. G. Adams told him to

2   interview plaintiff as to the Dec. 6, 2005, grievance, J.A. Diaz noting that plaintiff's complaint

3   involved the potential lockdown of the entire African American inmate population related to the

4   Dec. 13, 2005, scheduled execution of "Crip gang leader, Stanley 'Tookie' Williams," and

5   discrimination against African American inmates in housing and punishment.  Id., at 17-18.

6           After plaintiff explained his complaint as to housing and punishment of African

7   American inmates, defendant J.A. Diaz noted that plaintiff had been filing complaints against

8   CSP administration every month since his arrival and informed plaintiff that he had just attended

9   a staff meeting with defendant Associate Warden Ortiz, and several correctional officers (C/O's)

10  from the yard "where we discussed your complaint filing and your assisting other inmates with

11  their complaint filing against staff."  Defendant J.A. Diaz told plaintiff that "we're" not going to

12  tolerate his continued complaint filing, that the method of housing and disciplining of African

13  American inmates would not change, and that plaintiff would be transferred from CSP.  Id., at

14  18-19.

15          On Jan. 4, 2006, plaintiff was called to defendant J. Diaz's office, where J. Diaz

16  was present along with defendants J.A. Diaz and S. Tellerico, and plaintiff was informed by these

17  defendants that they were putting plaintiff up for transfer to "a 180 prison" because plaintiff had

18  filed too many complaints and defendant Warden Adams had told them to transfer plaintiff out of

19  CSP.  Plaintiff informed these defendants that he had not gotten any disciplinary write-ups in the

20  form of CDC-115's at CSP and asked why his security housing level was being upgraded and he

21  was to be transferred to a "180 design prison."  Id., at 20.

22          Defendants J. Diaz and Tellerico told plaintiff that "we don't want your kind here,

23  so you're being transferred," while defendant J.A. Diaz referred back to his Dec. 21, 2005,

24  interview with plaintiff, telling plaintiff that people like him "who file lawsuits and complaints

25  are troublemakers and they have to go."  Plaintiff replied that he would be filing a complaint

26  against each of these individuals, to which defendant J. A. Diaz responded: "[T]his is why we're

transferring you, to avoid having to respond to anymore of your complaints.  We'll get rid of you and we won't have to respond to, or return any of your complaints you have pending."  Id., at 21.

On March 21, 2006, before plaintiff received any appeal responses to grievances CSPC-3-06-00115, CSPC-3-06-00652 or CSPC-3-06-01022 or his complaint relating to classification and cell assignment of African American inmates, plaintiff was transferred to HDSP, with increased security level housing status, where he was housed on a 180 design yard for inmates with serious disciplinary problems.  Upon his arrival at HDSP, he was forced into a holding cell for African American inmates only.  On March 23, 2006, plaintiff was interviewed by three unit classification committee members (UCC), defendants D. Vanderville, D. Hellwig, and J. Owen, who told plaintiff that he was "a non-adverse transfer from Corcoran," but that there was a memo from CSP UCC members, defendants J.A. Diaz, J. Diaz, and Tellerico, saying that plaintiff files complaints and lawsuits and must be housed at an increased security housing level and on 180 design special housing.  Id., at 30-32.

Plaintiff was told by defendants Vanderville, Hellwig, and Owen that he would be housed on the C-Facility 180 yard because he was black, there were no open "black cells" on the 270 yard, and because Corcoran (CSP) had so advised them.  When plaintiff protested that he could be housed with any race, according to departmental policy and procedure, and that he had no disciplinary sanctions from CSP and did not display aberrant behavior to warrant increasing his security status from 270 to 180, he was told by these defendants that he was being upgraded because he filed "too many lawsuits and complaints on staff," and this way he could be confined to his cell for 23 hours a day which would prevent him from engaging in such activity.  Id., at 32-33.

Plaintiff complained that the CSR[16] endorsed him for housing on a 270 design yard, to which defendants Vanderville, Hellwig, and Owen replied that they did not have to

---

[16] Classification Staff Representative.

follow the endorsement, that plaintiff was black and no black cells on the 270 yard were open, that even if there were, he would not be housed there based on Corcoran's administration having said to upgrade his security housing level.  Plaintiff said that when he had arrived at HDSP Receiving and Release (R&R), he had arrived with white, Hispanic, and Asian inmates who were taken to be housed on the 270 yard.  In addition to being housed on a 270 design yard, he asked that he receive a clerk position equivalent to the job assignment as GED clerk he had had at CSP with a pay number.  These defendants told plaintiff the other inmates who were sent to be housed on the 270 design yard were not black and did not file complaints and lawsuits against staff and that at HDSP, "everything is done according to race" and black inmates who sue correctional staff do not receive clerk assignments.  Id., at 33-34.

Plaintiff moves for summary judgment on his claims that defendants Ortiz, J.A. Diaz, J. Diaz, and Tellerico at Corcoran (CSP) and defendants Vanderville, Epperson, Owen and Hellwig at High Desert State Prison (HDSP) pursue an unconstitutional, race-based classification/housing assignment policy and practice at those prison facilities.  PMSJ, Doc. #71, pp. 13, 17-18, 25, 38-48, 54-64.

### Equal Protection Claim

The Equal Protection Clause of the Fourteenth Amendment provides that "[n]o state shall . . . deny to any person within its jurisdiction the equal protection of the laws."  See Johnson v. California, 543 U.S. 499, 125 S. Ct. 1141 (2005) (under equal protection challenge, state corrections department's unwritten policy of double-celling new/transferred inmates in initial 60-day evaluation with cellmates of same race is subject to strict scrutiny standard of review).  Johnson did not determine whether the CDC policy at issue violated the Equal Protection Clause, remanding for that determination, but did hold strict scrutiny to be the applicable standard of review.  Johnson, supra, at 515, 125 S. Ct. at 1152.  To survive strict scrutiny, defendants must demonstrate that any prison racial classification "policy is narrowly tailored to serve a compelling state interest."  Johnson, supra, at 509, 125 S. Ct. at 1148.

1                   *Undisputed Facts*

2              Defendants expressly do not dispute, with regard to plaintiff's claims against

3    defendants Ortiz, J.A. Diaz, J. Diaz and Tellerico, plaintiff's undisputed fact (PUF) no.7, wherein

4    plaintiff states that from December 17, 2004, until March 21, 2006, plaintiff was housed at CSP

5    and during his entire stay at CSP, he was classified as African American.  They also concede

6    with respect to plaintiff's PUF no. 14 that, from December 17, 2004 to March 21, 2006, plaintiff

7    did not live in a cell with a Caucasian or Hispanic inmate.  Although plaintiff cites in support of

8    his PUF no. 8, that defendants admit through discovery that for Level 3 and Level 4 inmates

9    "race is one of several factors used in the making of housing assignments at C.S.P," a document

10   produced during discovery by defendant Adams,[17] the CSP Operational Procedure No. 801 Intake

11   Housing Unit/Inmate Orientation for General Population (dated June 2004), defendants object

12   that plaintiff mischaracterizes the response by reading an admission into the mere production of

13   documents, assuming that one defendant's discovery response applies to all defendants and

14   assuming facts not in evidence.  In addition in defendant Adams' declaration in Opp. to PSUF

15   (doc. # 81–3) at ¶ 7, Adams denies any admission as to race being one of several factors in the

16   housing assignments for inmates in Levels 3 and 4 inmate, only conceding that he did produce

17   Operational Procedure 801.  This procedure does not, as Adams' maintains, contain the specific

18   statement as to race that plaintiff puts in quotation marks.  However, plaintiff, in response, points

19   to the statement within the procedure which references "ethnic background" as a case factor

20   (which, in fact, appears to be the first or primary factor, see footnote 21) for evaluating a newly

21   arrived general population inmate for a cell assignment, although it is unclear that this is limited

22   to Level 3 and 4 inmates.[18]  PMSJ Doc. # 73, p. 43; Doc. # 88, p. 15.  In addition, in light of

23

24        [17] Defendant D.G. Adams has been voluntarily dismissed with prejudice apparently only
     as to plaintiff's Fourteenth Amendment equal protection housing claims.

25        [18]  Evaluation of the following factors for housing of newly arrived inmates at CSP "will
     be based on, but not limited to, the following case factors: *ethnic background*, medical factors,
26   psychological factors, enemy problems, gang affiliations, escape potential, region of

1   Adams' concession that he produced the document, the authenticity of which he does not

2   challenge, to the extent that defendants object to it, the objection is not well-founded; however,

3   this document dated June 2004, does not of itself dispositively implicate defendants in a race-

4   based policy following the Johnson decision.   Plaintiff maintains as PUF no. 9 that from

5   December 17, 2004 to March 21, 2006, during his entire stay at C.S.P., defendants refused to

6   allow him to be housed with inmates classified as white, Hispanic, or Asian.   Plaintiff relies on

7   defendant Adams, Supplemental Response to Request for Production of Documents, Set One,

8   RFP No. 9, but the court is unable to locate any document identified as such.  PMSJ Doc. # 72.

9   He also relies on his own declaration.  PMSJ Doc. # 72, p. 8; Doc. # 73 (plaintiff's Dec., pp. 2-4,

10  8-10; Doc. # 88, 16.  In dispute, defendants reference some eleven (11) declarations from

11  defendants (and former defendants), five of which state in relevant part:

12          I did not refuse to allow Mitchell to be housed with inmates of
            other races.[19]  Corcoran State Prison has not had a policy or
13          practice of segregating inmates based on race.  Corcoran State
            Prison's policy and practice for cell housing of compatible inmates
14          has been governed by Title 15, Section 3375-Classification, and
            Departmental Operations Manual, Sections 62010.5 through
15          62010.12.  *An inmate in General Population may request cell
            housing with a particular inmate of another race— having similar
16          classification scores and factors— if that inmate gives his consent.
            Inmates of different races who wish to house together assume the
17          increased risk of violence against them by other inmates who
            disapprove of integrated housing.  But two inmates of different
18          races— who do not both give their consent— will not be housed
            together because of the danger of racial violence between them, or
19          by other inmates.* [Emphasis added herein.]

20  Defendants' D&UF in support of Opp. to PMSJ, p. 6, citing defendants' Ex. B, Adams' Dec. ¶ 4;

21  Ex. C, Ortiz Dec. ¶ 4,[20] Ex. E, J. Diaz Dec. ¶ 5; Ex. F, J.A, Diaz ¶ 6; Ex. L, Tellerico[21] Dec., ¶ 5.

22  _____

23  commitment, age and any other special characteristics of the individual inmate prior to cell
    assignment."  Doc. # 73, p. 43 [emphasis added].

24      [19] Or, alternatively, the paragraph begins: "I did not prevent Mitchell from being housed
    with inmates of other races."  See, e.g., Ex. E., J. Diaz Dec. ¶ 5.
25

26      [20] Ex. D, Daviega Dec. ¶ 4, also relied on by defendants, as well as Exs. G, H, I, J, K in
    the declarations of Galaviz, Streeter, Chatham, Hill, Hubach, respectively, they generally simply

Defendants pose objections attempting to dispute plaintiff's statement of undisputed facts by

asserting that they have no race-based housing, plaintiff did not present them with Inmate

Chiamulon's consent to be housed with plaintiff,[22] and more.   But it is defendants' own

declarations in support of the opposition to plaintiff's PMSJ that prove plaintiff's argument.

Although Cal. Code Regs. tit.xv, § 3375 does not appear to reference race or ethnicity as a housing

factor and the undersigned is unable to determine whether the sections of the DOM referenced

above make any such reference as defendants have not provided those sections in support of their

opposition to the PMSJ (or in support of their to CMSJ), the actual policy as articulated which

the court has italicized both expressly on its face and implicitly violates Johnson v. California,

543 U.S. 499, 125 S. Ct. 1141.  Defendants' argument – that a compelled segregation unless an

inmate of a different race/ethnicity "allows" the integration does not implicate an actionable

discrimination claim in violation of equal protection – is mystifying.  It is as though post-Brown

v. Board of Education of Topeka, 347 U.S. 483, 74 S. Ct. 686 (1954), school authorities

maintained that they had no race-based policy because so long as a student of one race could

obtain the consent-to-attend of a student or students of another race at a given school, he or she

would be permitted to attend that particular school.  The obviously deficient rationale in the

school setting is equally deficient in the prison setting.  The idea that somehow because all

inmates are segregated by race or ethnicity, African American inmates are not thereby subjected

disavow any involvement in plaintiff's housing

[21] The spelling of "Tellerico" in his declaration and in defendants' statement of undisputed facts in support of their summary judgment motion is typed as "Tallerico," elsewhere, however, in defendants' filings, the "Tellerico" spelling is maintained.

[22] This inmate's declaration does not support defendants' insistence that they have no race-based housing.  Within his declaration, Inmate Chiamulon avers that he sought to be reassigned to a cell with plaintiff on 1/12/06, but was told by correctional staff: "Mitchell is black and your [sic] Asian, so we can't put you guys in the same cell, because it goes against our policy."  Defs. Ex. R, Doc. # 81-18.

to racial discrimination smacks of the spurious, long discredited "separate but equal" doctrine.[23]

Of course, a compelling reason to discriminate may be justified.  The court understands that violence occurs in prisons for any number of reasons.  What defendants have failed to make any showing of, however, is how the housing policy or practice at issue is in any compliance whatsoever with the ruling of Johnson.  That is, defendants have not demonstrated that the practice or policy of requiring consent from inmates of differing races — simply because they *are* of different races — before they may be housed together could survive the application of the "strict scrutiny" standard of review mandated by Johnson.  It is not enough for defendants simply to cite the applicable Johnson standard for racial classification as they do in their motion for summary judgment.  MSJ, Doc. # 82-2, p. 11.  As plaintiff contends, defendants neither demonstrate nor even adequately address the question of how the housing policy is narrowly tailored to meet a compelling state interest.  PMSJ, Doc. # 71, pp. 40-45.  Plaintiff is willing to presume within his motion that inmate/prison safety is a compelling state interest, which, of course, the Johnson Court acknowledges,[24] nevertheless contending that the method of considering race is not shown to be narrowly tailored to achieve the goal of prison safety.  Id., at 45.  As plaintiff observes (id.), "[t]he purpose of the narrow tailoring requirement is to ensure that 'the means chosen "fit" th[e] compelling goal so closely that there is little or no possibility that the motive for the classification was illegitimate racial prejudice or stereotype.'"  Grutter v. Bollinger, 539 U.S. 306, 123 S. Ct. 2325 (2003), quoting Richmond v. J.A. Croson Co., 488 U.S., at 493, 109 S.Ct. 706 (plurality opinion).  In addition, the court notes that plaintiff

---

[23] "[I]in the field of public education the doctrine of 'separate but equal' has no place.  Separate educational facilities are inherently unequal.  Therefore, we hold that the plaintiffs and others similarly situated for whom the actions have been brought are, by reason of the segregation complained of, deprived of the equal protection of the laws guaranteed by the Fourteenth Amendment."  Brown v. Board of Ed., supra, at 495, 74 S. Ct. at 692.

[24] "The necessities of prison security...are a compelling government interest justifying only those uses of race that are narrowly tailored to address those necessities."  Johnson, supra, at 512, 125 S. Ct. 1141 [citations and internal quotations omitted].

1   maintains that despite the segregated housing, he and other African-Americans share dayroom,

2   toilet and shower facilities with inmates of other races.  PMSJ, Doc. # 71, p. 22.  If so, this would

3   tend to undermine defendants' ability to show that the present policy could be defended as

4   narrowly tailored, even had they attempted to do so.

5              Thus, it is that plaintiff need not provide evidence to support his statements of fact

6   that plaintiff was housed only with inmates classified as African American; that inmates Perea,

7   Victor Castill E-28486 and Chavez, Florencio V-45896 were not allowed to be housed with

8   plaintiff because they were classified as Hispanic-Mexican American; that inmate Richard A.

9   Chiamulon V-48226 was not allowed to be housed with plaintiff because he was classified as

10  Asian American; that from December 17, 2004 to March 21, 2006, they were not acting in

11  accordance with department policy/procedure relating to cell housing integration of African

12  American inmates with Caucasian and/or Hispanic inmate inmates on Facility 3B, all of which

13  plaintiff maintains defendants have "admit[ted] through discovery."   PMSJ, Doc. # 72, pp. 8-9;

14  Doc. # 88, pp. 18-22.  As to plaintiff's assertion, as previously noted, that from December 17,

15  2004 to March 21, 2006, plaintiff did not live in integrated cell living/housing with Caucasian

16  and/or Hispanic inmates while incarcerated at C.S.P. on Facility 3B, plaintiff's do not dispute

17  that much of PUF no. 14.  Def. D&UF in support of Opp. to PMSJ, Doc. # 80, p. 7.

18             It is not plaintiff's insistence that defendants failed to comply with CDCR housing

19  and classification regulations by means of the race-based housing that make this issue dispositive

20  for him.  Rather, it is because defendants themselves, perhaps unwittingly, have affirmatively set

21  forth a housing/classification policy that is flatly discriminatory based on race.  Defendants' own

22  facts and evidence set forth in their statement of disputed and undisputed facts in opposition to

23  the PMSJ state in relevant part:

24             7. An inmate in General Population may request cell housing with
               a particular inmate of another race—having similar classification
25             scores and factors—if the other inmate gives his consent. (Defs.'
               Ex. B, Adams Decl. ¶ 4; Defs.' Ex. M, Vanderville Decl. ¶ 6.)

26

8. Inmates of different races who wish to house together assume the risk of increased violence against them by other inmates who disapprove of integrated housing. (Defs.' Ex. B, Adams Decl. ¶ 4; Defs.' Ex. Vanderville ¶ 6.)

9. But two inmates of different races—who do not both give their consent—will not be housed together because of the increased danger of racial violence between them, or by other inmates. (Defs.' Ex. B, Adams Decl. ¶ 4; Defs.' Ex. M, Vanderville Decl. ¶ 6.[25])

Defs. D&UF in Opp. to PMSJ, Doc. # 80, p. 14.  These statements are echoed in defendants'

own statement of undisputed facts in support of their own cross-motion for summary judgment.

DUF nos. 13 through 15 in support of CMSJ, Doc. # 82-2, p. 19.  And both sets of facts rely for

their support upon the declarations of CSP defendant Adams and HDSP defendant Vanderville,

implicating the defendants at both facilities in this Fourteenth Amendment violation.  Thus,

defendants' effort to dispute plaintiff's undisputed fact no. 10 in support of his PMSJ, which, in

essence, states that defendants have admitted that they housed plaintiff only with inmates

classified as African American, fails on its face by way, ironically, of the very declarations on

which defendants rely in seeking to dispute PUF no. 9.  Moreover, defendants' contention, in

support of their own MSJ, in DUF no. 16, that the Asian inmate named Chiamulon, whose

written consent to be housed with plaintiff at CSP they evidently do not question (defendants'

Ex. R), never gave that consent to defendants is a red herring (see footnote 22), even if literally

true as to these particular defendants.  CMSJ, DUF, Doc. # 82-2, p. 19.  Again, it is the

defendants' self-proclaimed requirement of the consent at all that implicates the housing policy at

CSP and HDSP as unconstitutionally discriminatory on its face.  Bottom line – <u>Johnson</u> would be

a completely idle act on the part of the Supreme Court if all that were needed to be done to avoid

its import, and to justify omnibus prison segregation, would be a general statement of "danger in

prison" if the races were mixed.

[25] See also, Vanderville Dec. ¶ 14.

1    The only exception applies to defendant Epperson, wherein plaintiff expressly

2 states it is undisputed that he was not involved in plaintiff's housing at HDSP, thus, no genuine

3 issue of material fact as to this claim against this defendant remains to be resolved and summary

4 judgment should be entered for defendant Epperson on plaintiff's Fourteenth Amendment claim.

5 CMSJ, DUF 12, Doc. # 82-2, p. 19; plaintiff's D&UF in Opp. to CMSJ, p. 4.

6    *Qualified Immunity*

7    The only question that remains is whether the defendants at CSP and HDSP

8 against whom plaintiff alleges Fourteenth Amendment violations based on the race-based

9 housing policy are entitled to qualified immunity.  Defendants contend that they are entitled to

10 qualified immunity on plaintiff's First and Fourteenth Amendment claims because, they argue,

11 defendants did not violate plaintiff's constitutional rights and a reasonable officer would consider

12 the actions taken by defendants to be lawful inasmuch as they advanced legitimate goals of

13 housing and institutional efficiency.  CMSJ, Doc. 82-2, p. 13.

14    In resolving a claim for qualified immunity, as previously set forth, the court

15 addresses two questions: (1) whether the facts, when taken in the light most favorable to plaintiff,

16 demonstrate that the officer's actions violated a constitutional right and (2) whether a reasonable

17 officer could have believed that his conduct was lawful, in light of clearly established law and the

18 information the officer possessed.  Anderson v. Creighton, supra, 483 U.S. 635, 107 S.Ct. 3034.

19 Lower courts may consider these two questions in the order that makes the most sense given the

20 circumstances of the case.  Pearson v. Callahan, supra,--- U.S. ---, 129 S. Ct. 808.

21    In defendants' CMSJ, defendants conclusorily and wrongly state that they are

22 entitled to qualified immunity because they did not violate plaintiff's constitutional rights.

23 CMSJ, Doc. # 82-2, p. 13.  With regard to the second prong for qualified immunity, they contend

24 that "a reasonable officer would consider defendants' actions — which advanced legitimate

25 correctional goals of housing and institutional efficiency — to be lawful."  Id.  Unfortunately,

26 however, for defendants, this is not the applicable standard for a reasonable officer, in light of

35

Johnson.  The only possible basis under which any of these defendants could be entitled to

qualified immunity would be if it could be shown that the law was not clearly established at the

time that the race-based classification and housing practices and policies were enforced by them.

> The incident took place on February 18, 2005. At the time, the
> Ninth Circuit held that a prison racial segregation policy only had
> to be "reasonably related to legitimate penological interests." *See
> Turner v. Safley*, 482 U.S. 78, 89 (1987); *see also Johnson v.
> California*, 321 F.3d 791, 799 (9th Cir.2003), overruled by
> *Johnson v. California,* 543 U.S. 499 (2005). On February 23, 2005,
> the United States Supreme Court decided *Johnson v. California*,
> 543 U.S. 499 (2005).  *Johnson* held that all racial classifications
> were subject to strict scrutiny. Id. at 509. Therefore at the time
> Plaintiff's equal protection claim arose, Defendants were not on
> notice that racial segregation related to safety reasons clearly
> violated inmates' equal protection rights. Moreover, even *Johnson*
> did not hold that racial segregation motivated by security
> considerations was unconstitutional. *See id.* at 515 ("We do not
> decide whether the CDC's policy violates the Equal Protection
> Clause. We hold only that strict scrutiny is the proper standard of
> review...."). Therefore the contours of the right remain undefined.
> Consequently, Defendants are shielded by qualified immunity on
> the equal protection claim.

Mayweathers v. Hickman, 2006 WL 4395859 *6 (S.D. Cal. 2006).  Of course, defendants do not

themselves flesh out any such argument and the court should not be burdened with undertaking

that analysis.  "[Q]ualified immunity is an affirmative defense, and the burden of proving the

defense lies with the official asserting it." Houghton v. South, 965 F.2d 1532, 1536 (9th

Cir.1992).  Defendants do not meet that burden by simply stating the standards for qualified

immunity without showing how the evidence establishes the defense and without setting forth

how the principles of qualified immunity doctrine apply to the facts of the case and to each

defendant.  Nevertheless, the undersigned, by reviewing the evidence that defendants either do

not address or fail to sufficiently refute demonstrate that although plaintiff, as to the CSP

defendants, has demonstrated that he was subjected to race-based cell housing assignments from

December 17, 2004, until March 21, 2006.  (In fact, it is undisputed that from December 17,

2004, until March 21, 2006, plaintiff was housed at CSP and during his entire stay at CSP, he

was classified as African American).

Whether a right is clearly established "turns on the 'objective legal reasonableness of the action, assessed in light of the legal rules that were clearly established at the time it was taken.'" Pearson v. Callahan, 129 S. Ct. at 822, quoting Wilson v. Layne, 526 U.S. 603, 614, 119 S.Ct. 1692 [] (1999).  Johnson v. California, 543 U.S. 499, 125 S. Ct. 1141, was decided on February 23, 2005, so that defendants could have argued that prior to that date, and thus for the period from December 17, 2004, until February 22, 2005, or thereabouts, the reasonableness standard of the now-overturned Johnson v. California, 321 F.3d 791, 799 (9th Cir. 2003) was the applicable established law.  If so, any of the CSP defendants (this would not apply to the HDSP defendants because plaintiff undisputedly was not transferred there until March 21 of 2006) who could establish a discrete involvement in plaintiff's housing that occurred before the Supreme Court's decision in Johnson, 543 U.S. 499, 125 S. Ct. 1141, might make a showing of being entitled to qualified immunity.  However, plaintiff states specifically in his declaration that a grievance with regard to alleged discrimination against African Americans inmates by requiring such inmates, including himself, to be double celled with African American inmates was submitted to CSP defendants Ortiz, J.A. Diaz, J. Diaz and Tellerico on December 6, 2005. Plaintiff's Dec. in Support of PMSJ, Doc. # 73, p. 2, ¶ 5.

> [U]nder *Johnson*, the defendants had to show that reasonable men and women could not differ regarding the necessity of a racial classification in response to prison disturbances and that the racial classification was the least restrictive alternative (i.e., that any race-based policies are narrowly tailored to legitimate prison goals). See *Johnson*, 543 U.S. at 505, 125 S.Ct. 1141. They have failed to carry this burden on Richardson's equal protection claim, as they have made no evidentiary showing at all concerning the basis for regarding all African-Americans as a security risk when one or a few African-American inmates are responsible for an assault.

Richardson v. Runnels, supra, 594 F.3d at 671-72 (9th Cir. 2010).  In their argument for entitlement of qualified immunity, defendants make no argument that the Supreme Court's decision in Johnson was not clearly established at the times relevant to this lawsuit.  In any event, it does not appear that any of the defendants could avail themselves of such an argument.  In

addition to the declaration noted above, within the allegations of the verified complaint, plaintiff

first specifically implicates the issue of segregated housing with reference to a December 6,

2005, grievance plaintiff avers that he submitted to the CSP defendants, alleging discrimination

against African American inmates in compelling them, including plaintiff, to double cell with

African American prisoners only, forcing non-affiliated African American inmates, including

plaintiff, to double cell with those who participated in active inmate gangs and by punishing

plaintiff and other non-gang affiliated African American inmates for serious rule violations

committed by the gang participants.  Complaint, pp 17, 55.  Nothing in any of the defendants'

declarations addresses or refutes the timing of any such grievance.  For example, defendant Ortiz,

while stating that to his knowledge he was not involved in plaintiff's CSP housing or his transfer

to HDSP and denies participation in any discussions of plaintiff's complaint filing, also declares

that he served as associate warden at CSP from *late 2005 and early 2006* and, although he denies

that CSP had a practice or policy of segregating inmates, he nevertheless sets forth and evidently

endorses the very consent procedure that implicates Johnson.  Defendant Ortiz, therefore, cannot

claim entitlement to qualified immunity [emphasis added].  Defs. evidence in support of Opp. to

PMSJ, Ex. C, Ortiz Dec., Doc. # 81-4, pp. 2-4.

Defendant J.A. Diaz, similarly, declares that in late 2005 and 2006, he was

employed as facility captain at CSP and is currently a correctional lieutenant in the facility denies

having made disparaging or threatening comments to plaintiff or threatening him with a transfer

because he filed grievances and denies having told plaintiff that housing and discipline of

African American inmates would not change, but he, too, sets forth the same CSP consent policy

for inmates of different races.  Defs. evidence in support of Opp. to PMSJ, Ex. E., J.A. Diaz

Dec., Doc. # 81-7, pp. 1-3.  Defendant Diaz, declaring that in late 2005 and 2006, he was a CSP

correctional counselor and is now a correctional counselor II there, follows a similar pattern,

setting forth the unconstitutional housing practice.  Id., J. Diaz Dec., Doc. # 81-6, pp. 2-3.

Finally, defendant Tellerico (or Tallerico) declares that he was a correctional counselor at CSP in

1    late 2005 and 2006, and while he, too, denies plaintiff's allegations concerning disparaging

2    comments or telling plaintiff that he was being transferred to CSP because of his filing

3    grievances, also sets forth the infirm CSP housing policy.  Id., Tellerico/Tallerico Dec., Doc. #

4    81-13, pp. 2-3.  None of these defendants because they make no showing whatever that the

5    housing practice and policy they followed, endorsed or implemented was limited to a period of

6    time preceding the highest standard of review for race-based prison policies established by the

7    Johnson decision in early 2005, or that plaintiff's efforts to be housed with a cellmate of another

8    race, for purposes of this action, pre-dated that decision.  Moreover, they make clear that the

9    policy is on-going.  Thus, they make no showing whatever of entitlement to qualified immunity.

10            As to the HDSP defendants, Vanderville, Owen and Hellwig, they do not dispute

11   that ethnicity is a factor for classification/housing.  All deny any wrongdoing, but each set forth

12   the same housing/cell-assignment policy that is endorsed and implemented at CSP.  Defs.

13   evidence in support of Opp. to PMSJ, Ex. M., Vanderville Dec., Doc. # 81-14, pp. 2-5; Ex. N,

14   Owen Dec., pp. 2-4; Ex. O, Hellwig Dec., pp. 2-4.  Moreover, it is undisputed by defendants that

15   while plaintiff was housed at HDSP from March 21, 2006 to December 5, 2007, he was

16   classified as African American and housed only with inmates classified as African American.

17   Defs. D&UF in Opp. to PMSJ, PUF # 26, Doc. # 80, p. 10.  In addition, plaintiff's Ex. V is a

18   copy of HDSP's Operational Procedure # 502, "[e]thnicity" is set forth as the second criterion to

19   be considered with regard to "[i]nvoluntary [d]ouble [c]elling."[26]  Plaintiff's Dec. in support of

20   PMSJ, Doc. # 73, p. 120, 122.  Contradictorily, it would appear, in light of the espoused consent

21   requirement for inmates of different races to be housed together, that even in the instance of

22

---

23        [26] "In cases of institutional need, staff may house inmates in the same cell who have not
     previously requested to be housed together.  (1) Should the need arise to involuntarily double-cell
24   inmates, the following criteria will be considered: (a) Age (b) Ethnicity (c) Term Status
     (d) Gang Affiliation (e) County/Area of Commitment (f) Commitment Offense (g) Special
25   Security Needs (h) Psychiatric Needs (I) History of Assaultive Behavior (j) Previous Cell Fights
     (k) In custody misconduct (l) Victimization Concerns (m) DPP Status (n) DDP Status."
26   Plaintiff's Dec. in support of PMSJ, Doc. # 73, p. 120, 122.

1    "involuntary" double celling at HDSP, the consent of both such inmates would have to be

2    obtained first.  In addition, defendants expressly do not dispute RUF no. 31: which sets forth that

3    they admit through discovery that on June 27, 2006, Correctional Counselor II S. Babich issued

4    plaintiff a CDC-General Chrono 128-B which stated:

5           On 3/30/06, inmate Mitchell P-87230 currently housed in C4-101,
            filed an appeal that was formally reviewed as Log. No. HDSP-C-
6           06-00807 (copy of which is located in the miscellaneous section of
            this file).  In that appeal he contends that he, as an African
7           American, can house with anyone.  By implication, this means
            Mexican Americans, European Americans, Indian Americans,
8           Asian Americans, etc.  This is highly commendable and should be
            noted for future housing considerations.
9

10   Doc. # 80, p. 12; see Doc. #73, Ex. S, p. 113.  Again, unwittingly or not, by this undisputed fact

11   defendants makes the inference inescapable that the apparent uniqueness of such a claim by

12   plaintiff signifies that housing at HDSP was/is based, at least in part, on an inmate's racial or

13   ethnic identity.  And as the events that occurred at HDSP began in 2006, they could not avail

14   themselves of even a colorable argument of entitlement to qualified immunity on the basis that a

15   reasonable officer could have believed that his conduct was lawful, in light of clearly established

16   law and the information the officer possessed.

17          Therefore, the court finds that plaintiff's motion for partial summary judgment as

18   to his claims of Fourteenth Amendment violations in the race-based classification and housing

19   policies/practices against defendants Ortiz, J.A. Diaz, J. Diaz and Tellerico/Tallerico at Corcoran

20   State Prison and against defendants Vanderville, Owen and Hellwig at High Desert State Prison

21   should be granted and judgment entered for plaintiff on these claims.  Correspondingly,

22   defendants' cross-motion for summary judgment for these defendants on the Fourteenth

23   Amendment violations should be denied.

24                      _Retaliation Claim relating to the Transfer_

25          By his motion, plaintiff also seeks summary judgment in his favor against

26   defendants Vanderville, Owen and Hellwig on his claim of retaliation in violation of his First

                                          40

Amendment rights for housing plaintiff in a higher security Level IV 180 design facility when he had been classified for a Level IV- 270 design upon his transfer from Corcoran State Prison to High Desert State Prison.  PMSJ, pp. 23.  In his verified complaint, plaintiff alleges that on March 23, 2006, plaintiff was interviewed by three unit classification committee members (UCC), defendants D. Vanderville, D. Hellwig, and J. Owen, who told him he was "a non-adverse transfer from Corcoran," but that there was a memo from CSP UCC members, defendants J.A. Diaz, J. Diaz, and Tellerico, saying that plaintiff files complaints and lawsuits and must be housed at an increased security housing level and on 180 design special housing. Complaint, pp. 30-32.

Plaintiff was told by defendants Vanderville, Hellwig, and Owen that he would be housed on the C-Facility 180 yard because he was black, there were no open "black cells" on the 270 yard, and because Corcoran (CSP) had so advised them.  When plaintiff protested that he could be housed with any race, according to departmental policy and procedure, and that he had no disciplinary sanctions from CSP and did not display aberrant behavior to warrant increasing his security status from 270 to 180, he was told by these defendants that he was being upgraded because he filed "too many lawsuits and complaints on staff," and this way he could be confined to his cell for 23 hours a day which would prevent him from engaging in such activity.  Id., at 32-33.

Plaintiff complained that the CSR[27] endorsed him for housing on a 270 design yard, to which defendants Vanderville, Hellwig, and Owen replied that they did not have to follow the endorsement, that plaintiff was black and no black cells on the 270 yard were open, that even if there were, he would not be housed there based on Corcoran's administration having said to upgrade his security housing level.  Plaintiff said that when he had arrived at HDSP Receiving and Release (R&R), he had arrived with white, Hispanic, and Asian inmates who were

---

[27] Classification Staff Representative.

1   taken to be housed on the 270 yard.  In addition to being housed on a 270 design yard, he asked

2   that he receive a clerk position equivalent to the job assignment as GED clerk he had had at CSP

3   with a pay number.  These defendants told plaintiff the other inmates who were sent to be housed

4   on the 270 design yard were not black and did not file complaints and lawsuits against staff and

5   that at HDSP, "everything is done according to race" and black inmates who sue correctional

6   staff do not receive clerk assignments.  Id., at 33-34.

7           Plaintiff contends that this higher level security housing placement by the HDSP

8   defendants occurred at the direction of the defendants at CSP.  PMSJ, pp. 23, 49.  Plaintiff

9   asserts that the DOM section 61010.11.6 sets forth "Special Case Factors" for classification staff

10  to use for Level IV inmates before increasing their housing security status.  Id.  Should an inmate

11  meet the criteria for such an increase in security housing, that inmate is excluded from a Level IV

12  design institution.  Id.  Despite not meeting the guidelines for 180-design housing, plaintiff

13  maintains he was nevertheless excluded from a 270-design institution and forced to be housed in

14  the higher security 180-design facility from March 21, 2006 to December 5, 2007.  Id., at 23-24,

15  49-51.  Plaintiff claims that he was confined to his cell in 180-design housing while inmates of

16  various races who arrived at HDSP months after he had were housed in the lower security 270-

17  design facility.  Id. at 23, 49-52.

18          It is undisputed that since his July of 2000 arrival at the California Department of

19  Corrections and Rehabilitation he has always been classified as Level IV 270-design and housed

20  at institutions (i.e. Centinela Level IV-270 design and Corcoran Level IV 270-design) consistent

21  with his classification and housing security level endorsement.  It is also undisputed that plaintiff

22  was transferred from CSP to HDSP on March 21, 2006.  While plaintiff maintains that he was

23  transferred from CSP in retaliation for filing complaints, he does not set this forth as an

24  undisputed fact with supporting evidence within his PMSJ, and even expressly disavows this

25  allegation within the context of his motion for partial summary judgment.  Plaintiff's Response

26  to Defs. D&UF in Opp. to PMSJ, Doc. #88, p. 24.

1         Within his declaration, although not apparently set forth in his statement of

2  undisputed facts, plaintiff avers that he was interviewed by defendants Vanderville, Owen and

3  Hellwig, three unit classification committee members (UCC), at which time he was told that

4  while he was "a non-adverse transfer from Corcoran," a memo from CSP (UCC members J.A.

5  Diaz, J. Diaz, and S. Tellerico), said that "this inmate files complaints and lawsuits and he must

6  be housed at an increased security housing level and on 180 design special housing."  Plaintiff's

7  Dec. in support of PMSJ, Doc. # 73, p. 12.  In addition, plaintiff asserts that defendants

8  Vanderville, Owen and Hellwig told him he would be housed on the C-facility 180-design yard

9  because he was black, there were no open "black cells" on the 270-design yard and because CSP

10  had told them to house him in that fashion.  Id.  He then avers that he protested that he had no

11  disciplinary sanctions from CSP, that he did not display aberrant behavior warranting an increase

12  in his security status, but was told by the defendants that he was being upgraded because he filed

13  "too many lawsuits and complaints on staff" and that housing him at the higher custody level

14  would prevent him from "engaging in this type of activity."  Id. at 12-13.  Plaintiff does not,

15  however, provide any supporting documentation, other than his declaration, from which his

16  quoted remarks derive and defendants Vanderville, Owen and Hellwig flatly deny these

17  exchanges.  See Defs. Doc. # 81-14, Ex. M, Vanderville Dec. ¶¶ 2-4; Ex. N, Doc. # 81-15, Owen

18  Dec. ¶¶ 2-4; Doc. # 81-16, Ex. O, Hellwig Dec., ¶¶ 2-4.  In opposition, each of these defendants

19  maintain that plaintiff was placed in 180-design housing at HDSP because there was no bed

20  space available for him in the 270-design housing and all assert that his classification score

21  mandated his placement in a 270-design facility.  See id., and defs. D&UF in Opp. to PMSJ,

22  Doc. # 80, DF no. 16, p. 15.

23         Defendants purport to dispute the following PUFs: PUF no. 21: defendants admit

24  through discovery that from March 21, 2006 to December 5, 2007, plaintiff was on the waiting

25  list to be housed on Facility B (Level IV-270-design).  Defs. Doc. # 80, p. 9.  However,

26  defendant Vanderville states "[i]nmates in 180-design housing who requested housing in 270-

design Facility B were placed on a waiting list."  Defs. Doc. # 81-14, Ex. M, Vanderville Dec. ¶

5.  Also, defendant Vanderville, as plaintiff points out, declares: "I, and not defendants Owen and

Hellwig, made the statement in discovery that plaintiff was on the waiting list to be housed on

Facility B."  Vanderville Dec., ¶ 9; plaintiff's Doc. # 88, p. 30.  While defendants' objection that

one defendant's statement should not be imputed to others is correct, it does not undermine the

gravamen of the response.  As to PUF no. 22, plaintiff states that defendants admit through

discovery that from April 22, 2006 to December 15, 2007, plaintiff remained housed on Facility

C Level-IV 180 design while numerous inmates of various races (i.e., white, Hispanic, and black,

etc.) who arrived at High Desert State Prison for permanent housing several months after plaintiff

were housed on Facility B Level-IV-270 design.  Plaintiff's Doc. # 72, p. 13.  While defendants

assert that this is disputed (defs. Doc. # 80, p. 22), plaintiff points to defendant Owen's response

request for admission, set 2, no. 1, admitting that inmates of various races arrived during that

period of time were housed on Facility B.  Plaintiff's Doc. # 73, Ex. AA, p. 162; plaintiff's Doc.

# 88, p. 31.

As to ostensibly disputed PUF no. 25, that defendants, through discovery, admit

that from March 21, 2006 to December 5, 2007, there was available bed space to house plaintiff

on Facility B 270-design housing, and despite his having seniority to be moved there and

available bed space, defendants passed him over and housed other inmates there who arrived

several months after plaintiff, defendant Vanderville states in his declaration that while 180-

design inmates who asked for housing in 270-design Facility B were placed on a waiting list, "[a]

times, inmates who came from other institutions were placed on available 270-design housing

before those on the waiting list.  Placing newly-arrived inmates directly in 270-design housing

involved less paperwork than transferring an existing inmate such as Mitchell from 180-design

housing, and having to fill that inmate's vacancy in 180-design housing."  Vanderville Dec. ¶ 5.

Both defendants Owen and Hellwig confirm this declaration.  Owen Dec. ¶ 5; Hellwig Dec. ¶ 5.

Further, defendant Vanderville, while asserting that neither defendants Owen or Hellwig made

1    the statement, confirmed that he did make the statement in discovery "that the actual movement

2    or transfer of inmates to Level IV-270-design Facility B is done on a seniority date of eligibility

3    meaning first come first moved based on bed space availability, ethnic balance and overall

4    security and program needs."   Vanderville Dec. ¶ 8.  It is a logical inference to be drawn that

5    defendants are reaching for an explanation as to why plaintiff was not placed on, or moved to

6    Facility B 270-design housing since it was conceded that plaintiff was on the waiting list for

7    housing in Facility B 270-design housing and that such movement on the one hand is done, at

8    least in part, on a seniority date of eligibility when they contradictorily assert it is not done on

9    that basis because placing newly arrived inmates there somehow involves less paperwork.

10        While the court does not find that plaintiff is entitled to summary judgment on his

11   claim of retaliation on this showing with regard to his housing at HDSP, given his burden,

12   neither do defendants make a dispositive showing that what occurred advanced legitimate

13   correctional goals rather than being retaliatory and that they are entitled in their cross-motion to

14   qualified immunity on this claim.  Genuine issues of material fact remain in dispute on this claim

15   that should be resolved by a jury.

16        In defendants' cross-motion for summary judgment on the claim that plaintiff has

17   not shown retaliation by the CSP defendants in transferring him to HDSP, defendants Ortiz, J.A.

18   Diaz, J. Diaz and Tellerico, although conceding that plaintiff was endorsed for 270-design

19   housing, declare that the transfer occurred because the 3B COR IV yard was being converted to a

20   Level III non-CCCMS yard, Level IV inmates were among those reviewed for a transfer to a

21   facility that could accommodate their needs, plaintiff's classification score mandated his

22   placement in a Level IV facility and he could be housed in a 180-design facility consistent with

23   his Level IV placement score.  Defs. Ex. E, Doc. # 81-6, J. Diaz Dec. ¶ 6; Defs. Ex. B, Doc.# 81-

24   3, Adams Dec., ¶ 5; Defs. Ex. F, Doc. # 81-7, J.A. Diaz Dec. ¶ 7.  Plaintiff in opposition points

25   to his declaration that defendants J.A. Diaz, J. Diaz and Tellerico told him he was being

26   transferred out of CSP to a higher security 180-design prison because of plaintiff's filing of

45

1   numerous complaints.  Opp. to CMSJ, p. 8; Doc. # 73, plaintiff's Dec., pp. 4-5, ¶¶ 9-10.  Plaintiff

2   also argues that defendants have not met their burden to provide any policy or regulation they

3   were following in transferring plaintiff from a lower security level at CSP to a higher security

4   level at HDSP.  Opp. to CMSJ, p. 8.  Defendants contend in reply that his retaliation claim fails

5   if the adverse action advances a legitimate correctional goal, that a prison policy's validity does

6   not depend on whether it is written or verbal and that plaintiff has not disputed their evidence

7   that he was transferred from CSP 180-design housing to HDSP so that CSP could provide

8   housing for Level III inmates.  Reply to Opp. to CMSJ, pp. 4-5, citing Rhodes v. Robinson, 408

9   F.3d 559, 567-68 (9th Cir. 2005) and Talib v. Gilley, 138 F.3d 211, 218[28] (9th Cir. 1998).

10         As defendants argue (CMSJ, Doc. # 82-1, p. 12 in the context of a defendant who

11   plaintiff has dismissed), relying on Rhodes, supra, at 567-568, for a claim to implicate First

12   Amendment retaliation, it must involve the following five elements: "(1) [a]n assertion that a

13   state actor took some adverse action against an inmate (2) because of (3) that prisoner's protected

14   conduct, and that such action (4) chilled the inmate's exercise of his First Amendment rights, and

15   (5) the action did not reasonably advance a legitimate correctional goal."   In citing Talib for the

16   proposition that a prison policy does not rest on whether or not it is written or verbal, defendants

17   omit that the question that remains "whether or not the record supports a finding that a policy

18   exists."  Talib at 215.

19         It is true that, in general, prison officials' housing and classification decisions do

20   not give rise to federal constitutional claims encompassed by the protection of liberty and

21   property guaranteed by the Fifth and Fourteenth Amendments.  See Board of Regents v. Roth,

22   408 U.S. 564, 569, 92 S. Ct. 2701 (1972).  Nor does the Constitution guarantee a prisoner

23   placement in a particular prison or protect an inmate against being transferred from one

24   institution to another.   Meachum v. Fano, 427 U.S. 215, 223-225, 96 S. Ct. 2532, 2538 (1976).

25

26         [28] Defendants cite a non-existent page in Talib.

1   See Rizzo v. Dawson, 778 F.2d 527, 530 (9th Cir. 1985) (prison authorities may change a

2   prisoner's "place of confinement even though the degree of confinement may be different and

3   prison life may be more disagreeable in one institution than in another" without violating the

4   prisoner's due process rights).

5         However, defendants have not shown a legitimate reason for having transferred

6   plaintiff if plaintiff can make a case that the transfer occurred because of complaints that he filed

7   regarding what this court has found to be a policy not in compliance with Johnson. As the Ninth

8   Circuit has stated, in agreeing with other circuits on this point "prison officials may not defeat a

9   retaliation claim on summary judgment simply by articulating a general justification for a neutral

10  process, when there is a genuine issue of material fact as to whether the action was taken in

11  retaliation for the exercise of a constitutional right." Bruce v. Ylst, 351 F.3d 1283, 1289 (9th Cir.

12  2003).

13        Nor do these defendants make an adequate showing of entitlement to qualified

14  immunity, Rhodes, supra, citing Pratt v. Rowland, 65 F.3d 802, 806 & n. 4 (9th Cir.1995)

15  ("[T]he prohibition against retaliatory punishment is 'clearly established law' in the Ninth

16  Circuit, for qualified immunity purposes. That retaliatory actions by prison officials are

17  cognizable under § 1983 has also been widely accepted in other circuits.") .

18        As to defendants Hill, Adams, Daviega and Hubach, plaintiff does not

19  move for summary judgment on his First Amendment claims of retaliation with regard to these

20  CSP defendants on his claims that they retaliated against him for filing of grievances.

21  Moreover, with regard to defendant Daviega, plaintiff has stated that it is undisputed that this

22  defendant did not retaliate against him, leaving no genuine issue of material fact to be resolved

23  and summary judgment for this defendant should be granted. CMSJ, DUF 31, Doc. # 82-2, p.

24  21; plaintiff's D&UF in Opp. to CMSJ, p. 8.

25        As to his claims for retaliation against defendants Hill, Adams, and Hubach, the

26  gravamen of his claim of retaliation against these defendants, within his verified complaint

47

appears to arise from plaintiff's interview, on Feb. 25, 2006, by defendant R. Hubach about

grievance no. CSPC-3-06-00115, wherein Hubach allegedly told plaintiff that defendants Adams

and Ortiz,[29] his supervisors, were tired of plaintiff's constant "snitching" and complaint filing

and had told Hubach to make the complaint "go away."   Defendant Hubach is alleged to have

told plaintiff that it could be in his "best interest" to withdraw CSPC-3-06-00115.  When plaintiff

protested, defendant Hubach told him that if the complaint was not dropped, plaintiff would be

put in administrative segregation (ad seg), "and we will see to it [] that you don't go home on

your release date."  Plaintiff withdrew the grievance in fear for his life and of losing his release

date.  Defendant Hubach's statements were made in front of unidentified inmates and

correctional staff.  Complaint, pp. 26-27.

In addition, defendants J.A. Diaz, Hill, and Hubach[30] are alleged to have conspired

together and threatened to physically harm plaintiff and place him in ad seg if he did not

withdraw his grievances, which he did out of fear in violation of his rights under the First

Amendment.  Defendants Adams, Ortiz, J.A. Diaz, Hill, Hubach, J. Diaz, Tellerico/Tallerico, all

threatened plaintiff with physical harm, with delaying his release date, with placing him in ad

seg, and conspired to retaliate against him in the form of a prison transfer, and denied him full

exhaustion of his administrative remedies.  Complaint, pp. 39-40.

As to defendant Epperson, within the verified complaint, plaintiff alleges that on

April 6, 2006, escorted plaintiff to where much of his legal and personal property had been

damaged and was confiscated, including, a cassette radio, new razors, a doctor-prescribed

knee/ankle brace wrap, Nike shower shoes, and other personal items and legal property,

including  plaintiff's case law and federal and state writs, and writing supplies.  Defendant

---

[29] As noted, although plaintiff included defendant Daviega as one of the supervisors, plaintiff does not dispute that Daviega did not retaliate against him.

[30] Plaintiff's claims against defendant Morrison were more particularly addressed in plaintiff's motion for partial summary judgment.

1   Epperson told plaintiff his property was being confiscated because plaintiff had had his lawyer

2   call and because he was black and housed on the C-Facility 180 design yard.  When plaintiff

3   stated that he was filing a complaint alleging violation of his constitutional rights, he was told by

4   Epperson that at HDSP things were done by racial classification and they did not answer to the

5   courts.  Id., at 36-38.

6           Defendants state that it is undisputed that defendants Adams, Ortiz, J. Diaz, J.A.

7   Diaz, Hill, Hubach and Epperson did not retaliate against Mitchell, citing as to DUF nos. 29-30,

8   32-33, 37-38 and 43, their respective declarations in support.  CMSJ, DUF, Doc. # 82-1,pp. 21-

9   22; Doc. # 81-2,  Defs. Ex. B, Adams Dec. ¶ 5; Doc. # 81-3, Ex. C, Ortiz Dec., ¶ 5; Doc. # 81-5,

10  Ex. E, J. Diaz Dec. ¶ 4; Doc. # 81-6, Ex. F, J.A. Diaz Dec., ¶ 5; Doc. # 81-10, Ex. J, Hill Dec., ¶

11  6; Doc. # 81-11, Ex. K, Hubach Dec. ¶ 4; Ex. P, Epperson Dec. ¶ 4.  Defendants Adams and

12  Ortiz declare that they did not retaliate against plaintiff for his complaints in any way or by

13  having him transferred to CSP.  They both state that they believe he was transferred based on

14  departmental needs because a CSP yard was being converted to Level III housing (as already

15  stated earlier) and that plaintiff, although endorsed for 270-design housing could be housed in a

16  180-design facility consistent with his Level IV placement score.  Defendants J. Diaz and J. A.

17  Diaz declare flatly that they took no retaliatory action against plaintiff for his filing of

18  complaints.  Defendant Hill declares that his actions were not motivated by retaliation for the

19  filing of grievances or complaints by plaintiff.  Defendant Hubach declares that he did not tell

20  plaintiff it was in his best interest to drop his grievance or threaten him with placement in ad seg.

21          Plaintiff seeks to dispute the DUF, citing his own declaration, wherein he avers

22  that he was told by defendant J.A. Diaz, at a December 21, 2005 interview regarding his racial

23  discrimination complaint, that defendants Adams and Ortiz and unnamed others had discussed

24  plaintiff's complaint filing and his assisting other inmates in filing complaints and that such

25  action was not going to be tolerated and the housing of African Americans was not going to

26  change and that his filing of so many complaints against staff was going to get him transferred

out of Corcoran.  Plaintiff's D & UF in Opp. to CMSJ, Doc. # 89; plaintiff's Dec. in support of

Reply brief (PMSJ) & Opp. to CMSJ, Doc. # 86 ¶¶ 17-18.  According to plaintiff, he was told, on

January 4, 2006, by defendants J. Diaz, J.A. Diaz, and Tellerico that he was being transferred out

of CSP to a higher security 180-design prison because he filed too many complaints and lawsuits.

When plaintiff asked why his security level was being increased, he states he was informed by

defendants J. Diaz and Tellerico that it was due to his complaints and lawsuits and by defendant

J.A. Diaz, when plaintiff said he was going to file a complaint about it, that this was why he was

being transferred so they would no longer have to respond to plaintiff's complaints.  Doc. # 86,

¶¶ 19-20.  Plaintiff declares that on February 25, 2006, he was told by defendant Hubach,

regarding his staff complaint CSPC 03-06-00115 that his supervisors, including Warden Adams

were tired of plaintiff's "constant snitching" and complaint filing and that Hubach had been told

to make them go away, that it would be in his best interest to drop or withdraw that complaint or

he would be placed in ad seg and that he would not be allowed to leave on his release date.  Doc.

# 86, ¶ 28.  Plaintiff states that he was told by defendant Hubach to drop that complaint and not

to pursue anymore; plaintiff avers that he did drop that appeal based on fear for his life and losing

his release date.  Doc. # 86, ¶¶ 28-29.  As to defendant Hill, plaintiff implicates him by way of

his declaration in the alleged actions taken by defendant Morrison with regard to plaintiff's legal

property (see above) and when plaintiff told Hill that he expected Morrison to be held

accountable, Hill became very upset and told plaintiff that the yard was run as "we see fit and we

don't have to answer to anyone.  Now, I'm telling you, if you know what's good for you, you'll

drop your complaints."  Doc. # 86, ¶¶ 21-25.  Thereafter, after defendant Morrison threatened

plaintiff with a "blanket party" for all his "snitching and filing complaints," both Morrison and

Hill laughed and said: "if you know what's good for you you better drop these complaints no.

CSPC-3-06-00652 and CSPC-3-06-00115."  Id., at ¶ 25.  With regard to defendant Epperson,

plaintiff itemizes the property plaintiff maintains this defendant confiscated and destroyed and

reasserts that she told him that his property was being confiscated because he had had his lawyers

1    call and because of his C-yard 180 housing.  Id, at ¶ 44.

2               As to defendants Adams and Ortiz about which plaintiff recounts no direct contact

3    or evidence but only indirect references through others, plaintiff fails to raise a genuine issue of

4    fact and defendants Adams and Ortiz should be granted summary judgment on this claim.

5    However, plaintiff's disputes as to each of the declarations of defendants J.A. Diaz, Hill, Hubach,

6    J. Diaz, Tellerico/Tallerico, and Epperson with his own becomes a credibility determination

7    which the court has previously observed cannot be made on this motion.  <u>Dominguez-Curry v.</u>

8    <u>Nevada Transp. Dept.</u>, 424 F.3d at 1036.  Nor can these CSP defendants make a showing of

9    entitlement to qualified immunity, <u>Rhodes</u>, <u>supra</u>, citing <u>Pratt v. Rowland</u>, 65 F.3d 802, 806 & n.

10   4 (9th Cir.1995).

11                    <u>*Supplemental State Law Claim of Negligence*</u>

12               Defendants contend that plaintiff's supplemental state law negligence claim

13   should be dismissed on the ground that defendants' conduct was reasonable.  The basis for his

14   state law claim appears to be that defendants have inflicted physical, mental and emotional

15   injuries upon him by their acts and omissions and that he has lost wages, legal and personal

16   property, and suffered "severe pain, humiliation, indignities...."  Complaint, pp. 49-50.  The

17   gravamen of plaintiff's allegations, however, do not implicate the state tort claim of negligence.

18   All of the acts of which plaintiff complains constituted wrongly motivated or not, were

19   intentional, not negligent, conduct.  Plaintiff is simply relabeling his constitutional claims as

20   "negligent."  To the extent that plaintiff might seek to proceed upon a claim regarding negligent

21   infliction of emotional distress, under California state law, there is no independent tort of

22   negligent infliction of emotional distress.  <u>Potter v. Firestone Tire & Rubber Co.</u>, 6 Cal.4th 965,

23   984, 25 Cal. Rptr.2d 550 (1993).  Moreover, under the PLRA,[31] there is a physical injury

24   requirement before plaintiff can seek damages for emotional distress on his Fourteenth

25

26          [31] Prison Litigation Reform Act.

1   Amendment claims.  Oliver v. Keller, 289 F.3d 623, 628 (9th Cir. 2002) ("42 U.S.C. 1997e(e)

2   requires a prior showing of physical injury that need not be significant but must be more than *de*

3   *minimis*").  Section 1997e(e) does not foreclose plaintiff from seeking mental or emotional injury

4   damages based on his First Amendment claims.  Canell v. Lightner, 143 F.3d 1210, 1213 (9th Cir.

5   1998).  However, as noted, plaintiff has no negligent infliction of emotional distress claim with

6   respect to his state law negligence claim when there is no colorable underlying negligence claim.

7   The court finds that defendants are entitled to summary judgment on this claim.

8           Accordingly, IT IS ORDERED that:

9           1.  The court having found that the parties have stipulated to the voluntary

10  dismissal with prejudice of plaintiff's claims against defendants Streeter, Chatham and Galaviz,

11  as well as plaintiff's Fourteenth Amendment claim of a violation of his right to equal protection

12  against defendants Adams, Morrison, Daviega, Hill and Hubach based on plaintiff's having been

13  subjected to segregated housing, pursuant to Fed. R. Civ. P. 41(a)(ii), these claims and

14  defendants have been voluntarily dismissed with prejudice and the Clerk of the Court is to note

15  their dismissal in the docket.

16          2.  Plaintiff's December 15, 2009 (docket # 76), motion for sanctions for

17  defendants' failure to file a timely opposition to plaintiff's partial summary judgment motion is

18  denied.

19          IT IS HEREBY RECOMMENDED that:

20          1.  Plaintiff's motion for partial summary judgment, filed on November 24, 2009

21  (docket # 71) be granted in part and denied in part:

22               a) Granted as to plaintiff's claims of a violation of his rights under the

23  Equal Protection Clause of the Fourteenth Amendment as to defendants Ortiz, J.A. Diaz, J. Diaz,

24  Tellerico/Tallerico, Vanderville, Owen and Hellwig, and judgment be entered for plaintiff on

25  these claims;

26               b) Denied as to plaintiff's claims of a violation of his First Amendment

1   rights on plaintiff's claim of retaliation by defendant Morrison for plaintiff having filed

2   grievances and complaints and for his allegedly having denied him access to the courts;

3                   c) Denied as to plaintiff's claims that defendants Vanderville, Owen and

4   Hellwig retaliated against him by placing him at a higher custody level;

5                 2.  Defendants' cross-motion for summary judgment, filed on December 28, 2009

6   (docket # 78), be granted in part and denied in part:

7                   a) Granted as to plaintiff's claim of a violation of his First Amendment

8   rights by defendant Morrison with regard to a denial of his right to access to the courts only;

9                   b) Denied as to plaintiff's claim that defendant Morrison retaliated against

10   plaintiff in violation of the First Amendment for filing inmates grievances/complaints, and that

11   this claim proceed;

12                   c) Granted as to defendant Epperson on plaintiff's claim of a Fourteenth

13   Amendment Equal Protection violation;

14                   d) Granted as to defendant Daviega on plaintiff's First Amendment

15   retaliation claim;

16                   e) Denied as to plaintiff's claims that defendants Vanderville, Owen and

17   Hellwig retaliated against him by placing him at a higher custody level and that these claims

18   proceed;

19                   f) Granted as to plaintiff's claims against defendantsAdams and Ortiz on

20   plaintiff's claims of retaliation;

21                   g) Denied as to plaintiff's claims of retaliation by defendants J.A. Diaz,

22   Hill, Hubach, J. Diaz, Tellerico/Tallerico and Epperson because of grievances and complaints by

23   plaintiff and that these claims proceed;

24                   h) Granted as to plaintiff's supplemental state law negligence claim

25   against all defendants.

26                 These findings and recommendations are submitted to the United States District

Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within fourteen

days after being served with these findings and recommendations, any party may file written

objections with the court and serve a copy on all parties.  Such a document should be captioned

"Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections

shall be served and filed within fourteen days after service of the objections.  The parties are

advised that failure to file objections within the specified time may waive the right to appeal the

District Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

DATED: 07/26/10

/s/ Gregory G. Hollows

_____

GREGORY G. HOLLOWS
UNITED STATES MAGISTRATE JUDGE

GGH:009
mitc2321.msj